CUMMINGS et al. v. MIDSTATES OIL CORPORATION et al.

(In Banc. Sept. 28, 1942. Suggestion of Error Overruled Nov. 2, 1942.)

[9 So. (2d) 648. No. 35020.]

Henry & Barbour, of Yazoo City, for appellants.

678

James McClure, of Sardis, for appellant, F. H. Parker.

**Bridgeforth & Love**, of Yazoo City, for appellants, J. R. Dockery and K. Hughes.

**Miss Ruth Campbell,** of Yazoo City, for appellant, W. L. Ethridge, Trustee.

Wells, Wells, Lipscomb & Newman and L. O. Smith, Jr., all of Jackson, C. E. Cooper, A. D. Kennedy, Jr., Charles W. Barnes, Jr., and Charles L. Follansbee, all of Tulsa, Okla., for appellees, Midstates Oil Corporation and J. Ray Gaskey.

690

**J. G. Holmes,** of Yazoo City, for appellee, M. Carl Jones.

Argued orally by **James McClure** and **W. A. Henry**, for appellants, and by **Major Calvin Wells** and **C. E. Cooper**, for appellees.

**Roberds, J.,** delivered the opinion of the court.

The main question for decision herein is whether, as between the parties to this litigation, a tract of ten acres of land located in Yazoo County, Mississippi, is included within an oil, gas and mineral lease executed by W. F. Cummings and wife to J. H. Pendleton August 31, 1939. Jones, Gaskey and Midstates Oil Corporation, appellees, claim under that lease; appellants contend the ten acres are not covered by that lease. Cummings and wife, by bill, and the other appellants by admissions in answers and by cross-bills, sought in this suit to cancel, as a cloud on their titles, the leasehold claims of appellees. The description expressly excepted the ten acres but was followed by the usual intention, or cover-all, clause contained in such leases. The chancellor, after hearing oral proof of the circumstances surrounding the parties and the execution of the lease, held (1) that the cover-all clause contained words of conveyance and was more than a mere expression of intention and (2) the general intention clause controlled over the express exception, and that, therefore, the lease included the ten acres. We affirm the conclusion of the chancellor, but we do so on the ground that appellants, by their conduct and the acts and events hereinafter set out, have adopted a practical construction of, and ratified and confirmed, the Pendleton

lease as including said ten acres of land, and are estopped to assert otherwise. We do not pass upon either question decided by the chancellor.

The description in the Pendleton lease reads: "Southeast Quarter of the Southwest Quarter, and the Northeast Quarter of Southwest Quarter, and West half of Southeast Quarter, and the Southwest Quarter of the Southwest Quarter less Ten (10) acres off of West side of the Southwest Quarter of the Southwest Quarter, also Seven (7) acres off of South end of Northwest Quarter, all in Section 31, Township 10, Range 2 West. It is the intention that this lease shall also include all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys."

It is the usual oil, gas and mineral lease. It grants, leases and lets unto the lessee the described lands for the purpose of prospecting and producing, treating and preserving thereon, and transporting and marketing therefrom, etc., oil, gas and minerals, with the right to lay pipes, construct tanks, stations, etc., and do all things necessary to accomplish such purposes, for a period of ten years and as long thereafter as oil, gas or other minerals may be produced therefrom. It provides that if drilling operations are not commenced within one year the lease shall terminate, but lessee may keep it alive by paying a yearly renewal rental of one dollar per acre on the basis of 155 acres. There are other rights of lessee not necessary to set out.

The consideration to Cummings for the lease was (1) four hundred dollars cash, (2) one-eighth of the oil and gas sold and used, and if not sold or used. fifty dollars per gas well per year, and one-tenth of other minerals, which might be produced on the lands, and (3) the cash renewal rentals. Lessor has other rights not necessary to be set out. Lessor warrants and agrees to defend the title to the property conveyed, and lessee has the right

to discharge liens and encumbrances on the lands, using rents and royalties for that purpose.

Immediately after executing the Pendleton lease, Cummings began to sell and convey designated percentages of mineral rights in his land and in his royalty and rents under that lease, his grantees, in turn, conveying to others, some twenty-six in all, Cummings owning, when suit was filed, a small interest therein. These grantees were all parties to this suit. He conveyed these rights by three conveyances—one each to D. L. Staples and J. L. Britt, both dated September 1, 1939, conveying to each one-fourth of the minerals in place and of his royalty and rents, and the other to one W. J. Lutz, dated September 29, 1939, conveying one-half thereof. This should have been one-fourth, and on January 9, 1941, Lutz reconveyed to Cummings a one-fourth. F. H. Parker, the appellant mainly interested in this appeal, was half interested with Lutz. The Staples-Britt instruments are called "Royalty Conveyances;" the one to Lutz is designated "Mineral Right and Royalty Transfer."

The Staples conveyance grants, sells, conveys, assigns and delivers unto the grantee one-fourth interest in and to all of the oil, gas and other minerals in and under, and that may be produced from, the "Southwest Quarter of Southwest Quarter and the East half of Southwest Quarter, Less 25 acres off the North end, and West half of the Southeast Quarter less 25 acres off the North end, All located in Section 31, Township 10, Range 2 West, containing 155 acres more or less, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for oil, gas and other minerals and removing the same therefrom."

Then follow these provisions:

"Said land being now under an oil and gas lease executed in favor of J. H. Pendleton it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes ¼th One Fourth of all the

oil royalty, and gas rental or royalty due and to be paid under the terms of said lease, provided, however, the original term of said oil and gas lease shall not be extended without the written consent of the grantee first having been obtained.

"It is understood and agreed that One-Fourth of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to the said Grantee and in the event that the above described lease for any reason becomes canceled or forfeited then and in that event an undivided One Fourth of the lease interests and all future rentals and bonuses on said land for oil, gas and other mineral privileges shall be owned by the said Grantee, D. L. Staples, owning one-Fourth of all oil, gas and other minerals in and under said lands, together with One-Fourth of all oil, gas and other minerals in and under said lands, together with One-Fourth interest in all future events."

Then follows a general warranty clause, in which grantors agree to warrant and defend "the said property" against the claims of all persons, further granting unto the grantee the right to redeem the land from all liens and encumbrances and be subrogated to the rights of the holder thereof.

It will be seen that this instrument includes the southwest quarter of the southwest quarter of Section 31, without excepting the ten acres, and estimates the total acreage described at 155 acres. It then stipulates that said lands are under the Pendleton lease.

The Britt and Staples conveyances are alike except as to grantees.

The description in the Lutz instrument reads: "SW¼ of the SW¼ and the E½ of the SW¼, less 25 acres off the north end and W½ of the SE¼ less 25 acres off the north end, of Section 31, Township 10, Range 2 West, containing 155 acres." This is followed by a statement

that the parties believe the grantors own more land than is covered in the description, "and it is also understood that the present lease does not cover all the land owned" by the grantors, and the intent clause covers all land owned by grantors in Yazoo County. It then grants the right to do all things necessary to mine, drill, produce and save the oil, gas and minerals on said lands, and warrants the title to the designated interest in the minerals. This paragraph follows:

"This conveyance is made subject to any valid and subsisting oil, gas or other mineral lease or leases on said land, including also any mineral lease, if any, heretofore made or being contemporaneously made from grantor to grantee; but, for the same consideration hereinabove mentioned, grantor has sold, transferred, assigned and conveyed and by these presents does sell, transfer, assign and convey unto grantee, his heirs, successors and assigns, the same undivided interest (as ·the undivided interest hereinabove conveyed in the oil, gas and other minerals in said land) in all the rights, rentals, royalties and other benefits accruing or to accrue under said lease or leases from the above described land; to have and to hold unto grantee, his heirs, successors and assigns."

The only material differences between this conveyance and the Staples-Britt royalty conveyances are (1) this conveyance does not expressly describe the Pendleton lease and (2) in it grantor says he thinks he has more land than is described and his cover-all clause includes all lands he may own in Yazoo County. The only existing lease on the lands was the Pendleton lease. That was assigned by Pendleton to Jones and Gaskey September 7, 1939, and it and the assignment were filed for record that day. Therefore, while the Pendleton lease is not expressly described in the Lutz conveyance, the reference therein to existing lease could mean only the Pendleton lease. The reference in the Lutz deed to lands Cummings thought he might own other than those de-

scribed had no application to the ten acres, because (1) the ten acres were described and (2) it is not claimed by any one Cummings did not own the ten acres. On the other hand, it is admitted by all he did own that. Now, the rights of all appellants are derived, mediately or immediately, through one of these two types of conveyances, and some, for instance Parker, through both. In other words, as to these appellants (except as to Parker leases hereinafter set out) the conveyances and the only conveyances in their chain of title are royalty conveyances and mineral right and royalty transfers, and both instruments appear in most of the chains.

In each and all of them the land is described as the SW¼ of the SW¼; not one excepts the ten acres, and those which state the aggregate acreage give it at 155 acres. Each and all convey a designated royalty and rental interest under the Pendleton lease.

The conveyances were subject to the Pendleton lease. They vested in the grantees an interest in the Pendleton lease, with the right to share, to the extent of their respective interests, in the oil, gas and minerals which might thereafter be produced on the ten acres under that lease. The parties contracted on the basis of the Pendleton lease. The ten acre tract became a part of the consideration. It was an essential part of their agreements. The grantors warranted they owned and agreed to defend the title to the property conveyed and the grantees accepted the conveyances under the warranty. The grantors sold and the grantees purchased a part of the Pendleton lease, including the ten acres. It might be further added that the Federal Land Bank and the Land Bank Commissioner each had a trust deed on the Cummings land, including the ten acres, when the Pendleton lease was executed, which they subrogated to the Pendleton lease upon payment to them of the cash consideration for and future rentals in the lease until their debts should be paid, thereby, through the Pendleton lease, relieving

the ten acres of these encumbrances for the benefit of all of these subsequent owners. The renewal rentals were paid in August, 1940. All of these conveyances were of record, except one to appellant, J. T. Peoples, when Gaskey, on May 14, 1941, and Jones, on May 29, 1941, assigned the Pendleton lease to Midstates. The Staples and Britt conveyances were of record when Jones and Gaskey acquired the Pendleton lease September 7, 1939.

By these acts and agreements the parties have placed contemporaneous and practical construction on the Pendleton lease as including the ten acres. The rule is set out in 16 Am. Jur., page 536, Section 174, in these words: ''A deed which is ambiguous or uncertain may be definite and certain by the practical construction of the parties to it while in interest. The construction put on such a deed by the parties is an indication of their intention. Therefore, where the construction of a deed is doubtful, great weight is to be given to the construction put upon it by the parties, especially in the case of doubtful questions which must be presumed to be within their knowledge, and such practical interpretation of the parties themselves by their acts under a deed is entitled to great, if not controlling, influence.''

In Sumter Lumber Co. v. Skipper, 183 Miss. 595, 184 So. 296, 298, 835, this court used this language: ''And when the parties have for some time proceeded with or under the deed or contract, a large measure, and sometimes a controlling measure, of regard will be given to the practical construction which the parties themselves have given it, this on the common sense proposition that actions generally speak even louder than words.''

Such construction by the parties appears to carry much weight in oil and gas leases. Earp v. Mid-Continent Petroleum Corp., 167 Okl. 86, 27 P. (2d) 855, 91 A. L. R. 188; Sheridan Oil Co. v. Cunningham, 186 Okl. 618, 99 P. (2d) 497; Breard v. Pyramid Oil & Gas Co., 191 La. 420, 185 So. 303; Hinson v. Noble (Tex. Civ. App.), 122

S. W. (2d) 1082; Hopkins v. Texas Co., 10 Cir., 62 F. (2d) 691, certiorari denied 290 U. S. 629, 54 S. Ct. 48, 78 L. Ed. 547; Ramage v. South Penn Oil Co., 94 W. Va. 81, 118 S. E. 162, 31 A. L. R. 1509.

But these subsequent conveyances represented that the ten acres were under the Pendleton lease, and the grantees therein acquired rights under and became parties to that lease. By their acts and conduct and contracts they adopted, ratified and confirmed the Pendleton lease with the ten acres included therein.

In Grissom v. Anderson, 1935, 125 Tex. 26, 79 S. W. (2d) 619, 622, Frank and Taylor Anderson executed an oil and gas lease on lands to one Welch. The Anderson wives did not join in the lease and, being the homestead, the lease was inoperative under the Texas law. Welch assigned the lease to Grissom, and Grissom assigned to Adams the lease on part of the lands. Later Frank Anderson and wife executed a mineral deed to Bender conveying an undivided one-fourth of their one-eighth in the minerals in place, with this recital: ". . . said land being now under an oil and gas lease executed in favor of O. T. Welch, it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes one-fourth of their one-eighth of all of the oil royalty and gas rentals or royalty due to be paid under the terms of said lease. It is understood and agreed that one-fourth of their one-eighth of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to the said grantee. . . ." Taylor Anderson and his wife executed a mineral deed to Potts and Whatley conveying a portion of the oil and gas in place, which contained the same recital as the Bender deed. Taylor and Frank Anderson and their wives later executed to Stone a mineral conveyance of a small interest in the minerals in the land. This contained the same recital as above. Later Taylor and

Frank Anderson and their wives sold and conveyed special parts of their minerals in the land, with the same recitals. And yet later the Andersons and their wives executed an oil, gas and mineral lease to Thacker, Timmons and Haynes. In holding that these subsequent conveyances and recitals ratified and confirmed and gave life to the Anderson to Welch lease, although inoperative without the signatures of their wives, the court said: "Under the law the Welch lease was inoperative as to Taylor and Frank Anderson and their wives, and the power to make it operative rested exclusively with them. They exercised that power freely and voluntarily. They did not repudiate the Welch lease. On the contrary, a recognition of the lease was made in deeds executed by them in strict conformity with law, and the benefits arising therefrom accepted. By their acts in executing the royalty' deeds above described, they gave the lease life. Their acts constituted a ratification of the lease. The purposes of the statutes have been fully met. The rights of the parties acquired thereunder became valid and binding. After they have ratified the Welch lease in the manner described above, it is not the policy of the law to permit a repudiation thereof."

In Humble Oil & Refining Co. v. Clark, 126 Tex. 262, 87 S. W. (2d) 471, the court announced that, although a prior oil and gas lease was void because lessor was a minor, and although it had expired because of failure of lessee to pay or tender the renewal rent, such lease was revived and ratified and confirmed by and upon execution by the lessor after becoming of age of a conveyance to a third person of a one-half undivided interest in the minerals in the leased premises and designated interests in the rents and royalty under the described lease.

In Turner v. Hunt et al., 131 Tex. 492, 116 S. W. (2d) 688, 117 A. L. R. 1066, Wilson and wife, being the owners of a tract of land containing approximately 82 acres, on November 22, 1924, conveyed to Turner 24 acres off

the east side thereof, with the further right in Turner to survey and select one acre on the south side of the tract. On March 18, 1929, Turner executed to Joiner, trustee, an oil and gas lease on the 24 acres. On the same day Wilson executed to Joiner, trustee, such lease on the 82 acres, his description including the one acre to be later selected by Turner. The one acre was the land in controversy. In May, 1930, Turner conveyed to one Silvey a one-half undivided interest in his oil, gas and minerals in the 25 acres, which instrument contained this clause: "Said land being now under an oil and gas lease executed in favor of C. M. Joiner, it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes one-half of all of the oil royalty, and gas rentals or royalty due and to be paid under the terms of said lease in so far as it covers the above described property." Silvey conveyed to Jacobs and Pittner an interest under his conveyance. In the fall of 1930, Joiner, trustee, assigned his leases to Hunt Production Company. Early in 1934, Turner selected and located the one acre. He then executed an oil and gas lease on that one acre to Smith and Hedge.

Turner and others then filed this suit. At the time Hunt Production Company had brought in two oil wells on the 24-acre tract and some on the west 58 acres of the 82-acre tract but no well had been drilled on the one acre. The court held that Turner's conveyance to Silvey of an interest in the royalty under the lease from Wilson to Turner, which included the one acre in controversy, was a recognition and ratification of that lease by the parties to the Turner-Silvey conveyance and binding on them and their grantees. See Humble Oil Co. v. Clark, 126 Tex. 262, 87 S. W. (2d) 471.

Appellants realized the force of this situation, and on the closing of the trial in the lower court, moved the court for permission to amend their answer to the cross-bill of appellees, and set up that appellees, when the

consideration was paid to Pendleton, knew the ten acres were excepted in that lease, and they did not then ask Cummings to reform it, and accepted and recorded it in that form; and that before Jones and Gaskey assigned the lease to Midstates that Midstates was advised the ten acres were not included, and it accepted and recorded the assignment with such knowledge, and that thereby appellees are estopped to contend the ten acres are included. The chancellor first denied but later admitted the amendment. Assuming, but not deciding, that the amendment, if proved, set up a defense, the proof offered by appellants fell far short of proving waiver or estoppel on the part of appellees. The chancellor made no finding of fact in this regard. The burden of proof was upon appellants. Pendleton assigned his lease to Jones and Gaskey on September 7, 1939. When Pendleton got the lease from Cummings August 31st, he gave Cummings a draft, due in thirty days, for the consideration. But Cummings was paid cash upon the assignment by Pendleton and the draft was taken up. Cummings testified that on that occasion Pendleton took him to one side and told him that Jones and Gaskey thought that he, Cummings, did not have title to as much land as he was claiming. Cummings does not contend that he discussed this with Jones or Gaskey. Even so, it is not claimed the doubtful title had any reference to the ten acres. Cummings said he was working and paying taxes on twenty-five acres on the north of his land (There is some confusion whether this was twenty-five or fifty acres) to which his title was doubtful and that his Mother had asserted some homestead claim to three acres which did not touch the ten acres. Cummings' draft was for $387.50 but he was paid $400 cash, indicating, certainly, nothing was deducted for acreage shortage. Nor does this prove the parties did not think the ten acres were included, or that Jones and Gaskey placed no reliance upon the recitals in the Staples-Britt con-

veyances, which were then of record, nor did this affect the contractual obligations of the parties to the royalty conveyances and the mineral right and royalty transfers above set out.

The Gaskey assignment to Midstates is dated May 14, 1941. The contract between them, pursuant to which the assignment was made, is dated April 29, 1941. The Jones assignment to Midstates is dated May 29, 1941. The date of their contract, if there was a written contract, is not shown. After the amendment was allowed, the case was reopened on request of one of counsel for appellants, who took the stand and testified that a short time before the date of the Gaskey assignment (not shown whether before the date of their contract), at a meeting in his office, when, it appears, Jones, Gaskey and Cummings and a representative of Midstates were present, while he was preparing an affidavit showing the relationship of the Cummings heirs and when they ceased to reside on the property, to be executed by W. F. Cummings in support of his title, that Mr. Jones asked Mr. Cummings to insert in the affidavit that he, Cummings, had intended to include the ten acres in the lease, and that he, the attorney, would not permit Cummings to do that. Admitting, but not deciding, that the testimony was competent, it proves nothing except that Jones and Gaskey were contending the lease covered the ten acres and that Cummings intended it should do so. It does not prove that the ten acres were not a part of the consideration for the assignment, nor that the assignee did not rely upon the warranties and recitals in the various recorded mineral and royalty deeds, nor does it alter the obligations of the grantors and grantees who were parties to them.

But it is said this rule would not apply to appellant, Parker, who, in addition to owning a half interest in the Lutz mineral deed, was also the lessee in four leases describing particularly and only the ten acres. No other

appellant has a lease. Chronologically, Parker's deals were in this order: September 29, 1939, he was half owner in the Lutz mineral deed. January 9, 1941, Lutz reconveyed to Cummings one-fourth interest. March 21, 1941, Cummings executed to Parker a mineral right and royalty transfer to 8/155 in minerals and "in all the rights, rentals, royalties and other benefits . . ." under existing lease on said lands, and any other lands of lessor in Yazoo County. The only existing lease was the Pendleton lease. April 10, 1941, Cummings executed to Parker a lease on the ten acres alone, saying further: "It is our intention to grant, lease and let exclusively as above set out all the land we own in the above Sec. 31, T—10—2 West that is not included in that lease to J. H. Pendleton dated August 31, 1939, Recorded in Record Book of Deeds G. L. page 539, Yazoo County, Mississippi."

This is the first time in all of these conveyances the ten-acre tract was culled out and described separately, or excepted from the description of the 155 total acreage.

May 29, 1941, Mrs. Handwerker and Mrs. Duggan leased the ten acres to Parker.

June 12, 1941, Lee McCormick and J. L. Foster executed to Parker a lease on the ten acres.

On June 12, 1941, Parker executed to Foster a royalty deed to a small interest in his royalty on all of the land, saying: "This sale and transfer is made and accepted subject to an oil, gas and mineral lease now affecting said lands, but the royalties hereinabove described shall be delivered and/or paid to the purchaser out of and deducted from the royalties reserved to the lessor in said lease." It then provides what shall be the rights of the parties "in event of termination of the present lease." This could only refer to the Pendleton lease.

June 24, 1941, Britt executed a lease to Parker on the ten acres separately.

It is not perceived just why this situation should take Parker from under the rule. All of the leases to him, except the one from Cummings, were made after the Gaskey assignment to Midstates and all after the Jones assignment, except the Handwerker-Duggan lease, which is the same date as the Jones assignment, but not filed until July 7, 1941. All except the latter and Cummings leases were obtained after this suit was filed May 31, 1941. But all of his lessors except Cummings held under royalty conveyances describing and making the lease subject to and a part of the Pendleton lease, and Parker himself seemed to recognize that lease in his royalty deed to Foster. It is noteworthy that Parker appears to have paid small considerations for these leases, they being at that time of much value, it appearing that Midstates Oil Corporation had drilled ten wells on the premises other than the ten acres and had expended some three hundred thousand dollars in developing the property. It is significant also that all of these lessors, except Cummings, refused to give a warranty of title.

Appellant, Ethridge, trustee, says when he obtained his mineral deed from J. L. Foster on February 4, 1941, he had an opinion from an attorney that the ten acres were not included in the Pendleton lease. The attorney's report is in the record and that may be the meaning of it; nevertheless, Ethridge purchased through and under Foster, who had a royalty conveyance from both Staples and Britt, who had such conveyances from Cummings, all describing the Pendleton lease as including the ten acres, and the conveyance to Ethridge, trustee, conveyed to him an interest in the Pendleton lease, with a warranty of title. "It is the general rule that an estoppel operates on the privies of the original party." Wabash Drilling Co. v. Ellis, 1929, 230 Ky. 769, 20 S. W. (2d) 1002; 19 Am. Jur., p. 626, Sec. 28, and p. 627, Sec. 29.

Appellants make the further contention that the assignment by Pendleton to Jones and Gaskey did not as-

sign any interest in the ten acres; they say it excepted the ten acres and that the assignment contained no cover-all clause, as did the original lease. We do not so construe the effect of the Pendleton assignment. The first part of it describes the Pendleton lease, giving the date, lessors and lessee, and the lands particularly described in that lease. That is under the first "Whereas." The second "Whereas" says "the said lease and all rights thereunder and incident thereto upon the lands hereinafter described, are now owned by J. H. Pendleton." Then it acknowledges receipt of the stated consideration, and there follows the assigning clause reading: "I, the undersigned J. H. Pendleton hereby sell, transfer, set over and assign to M. Carl Jones and J. Ray Gaskey, equally all of my right, title and interest in and to said Oil, Gas and Mineral Lease, together with all the rights and privileges accorded under said lease, insofar as the same covers the following described lands therein, to-wit: All the lands above described and as described in said lease." The first two paragraphs of this instrument are descriptive recitals; the second assigns the lease and all rights thereunder and "all the lands above described and as described in said lease." The assigning clause transfers to the assignees all rights under the lease, with all the lands therein, including the intention clause thereof.

The conclusion we have reached is equitable and just. If production is had on said ten acres under the Pendleton lease, all parties hereto are entitled to share therein according to their respective vested interest. Also the chancellor found that when the Pendleton lease was executed, it was the intention of all parties to include therein all of the land owned by Cummings. There is no conflict about that in the evidence. Cummings frankly and repeatedly said that was his intention and that he did not know until about six months after the execution of the lease the ten acres had been excepted, although

there are some incidents in the record indicating he may have known it before then.

However, there is no doubt he intended to include the ten acres in the lease and thought at the time that had been done.

Affirmed.