523 So.2d 983 (1988)
C.L. THORNHILL, et al.
v.
SYSTEM FUELS, INC., et al.
No. 56166.
Supreme Court of Mississippi.
April 6, 1988.
*984 Don Barrett, Barrett, Barrett, Barrett & Patton, Lexington, Norman Gene Hortman, Jr., Gibbes, Graves, Mullins, Bullock & Ferris, Laurel, Richard D. Foxworth, Foxworth & Shepard, Columbia, Matthew Harper, Jr., Harper, Barham & Gholson, Laurel, William Wallace Allred, Collins, for appellants.
Kenneth I. Franks, Harry E. Neblett, Jr., Heidelberg, Woodliff & Franks, Glenn Gates Taylor, Copeland, Cook, Taylor & Bush, Jackson, Donald B. Patterson, Brookhaven, Deborah J. Gambrell, Hattiesburg, for appellees.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
The petition for rehearing is denied. The original opinion is modified in that Harris v. Griffith, 210 So.2d 629 (Miss. 1968), insofar as it conflicts with our holding in this case, is overruled.
C.L. Thornhill and others have appealed from a decree of the chancery court of Jefferson Davis County finding that a mineral conveyance to Thornhill in 1945 conveyed only a non-participating royalty interest rather than an undivided mineral interest of the minerals "in place." The only issue before us is a construction of this conveyance and determining which type interest was conveyed.
Persuaded Thornhill acquired an undivided one-half mineral interest to all minerals, subject only to the right reserved by the grantors to the bonuses and delay rentals from oil and gas leases, we reverse and render judgment for the appellants.

FACTS
Hardy McLeod and Joseph McLeod owned the Northwest Quarter of the Southwest Quarter (NW-1/4 SW-1/4) of Section 30, Township 6 North, Range 17 West, in Jefferson Davis County. On September 9, 1944, the couple executed an oil, gas and mineral lease covering the land in favor of Frank Ryba. Thereafter, on May 14, 1945, the McLeods executed a mineral deed to C.L. Thornhill conveying an undivided one-half (1/2) interest in the minerals. The deed to Thornhill appears on a standard "Form R-101 Mineral Right and Royalty Transfer" instrument. On the face of this deed was typed:
It is the intention of the grantors to convey, and they do hereby convey, twenty (20) full mineral acres of land of said tract.
Non-participating as to present or future lease rentals or bonuses.
A copy of the conveyance as it appears in the public record is attached as an appendix.
On July 28, 1948, four years after the mineral conveyance to him, Thornhill filed an application for ad valorem tax exemption on his mineral interest acquired from the McLeods. Paragraph (4) of the printed form states: "Fractional interest for which exemption is applied and nature of such interest: ..." Following this there is typed "1/2 Royalty."
After Thornhill received his interest, both Thornhill and the McLeods executed numerous instruments conveying fractional interests in the minerals and oil and gas leases. None of these conveyances are important to the issue before us.
On December 22, 1979, appellee System Fuels, Inc., spudded the A.M. Speights 30-13 Well on a 160-acre unit encompassing this forty acres. The Speights Well began producing oil on March 20, 1981. On November 11, 1980, System Fuels spudded the gas unit 30-12 on the tract, which began producing on February 6, 1981.
C.L. Thornhill and those claiming through him, the appellants here, filed suit in the chancery court alleging the McLeods, by the instrument in question, conveyed an undivided one-half mineral interest in all minerals in place, subject only to the reserved right of the grantors (as to such undivided one-half interest conveyed) to receive all bonuses and delay rentals *985 from the oil and gas lease in effect when the instrument to Thornhill was executed, as well as to all future oil and gas leases. The appellees, System Fuels, Inc., and others, answered, denying such ownership, and claiming that all Thornhill acquired by such conveyance was a non-participating royalty interest in the oil and gas produced, which carried with it no right to execute oil and gas leases on the land.
The chancellor found the conveyance to be a non-participating royalty interest only, and entered a decree in favor of appellees. Hence this appeal, with the sole question before us: Was this a mineral interest conveyance, or a non-participating royalty interest?

LAW
In Mississippi we have two basic types of ownership of interests in minerals.
First, by far the most common way the holder of an interest in minerals obtains his interest is either from a reservation of or a conveyance of a fractional interest in the minerals. Such a reservation or conveyance simply creates a tenancy in common between the parties as to the minerals. Thus, if A reserves an undivided one-half interest in the minerals in his deed conveying Blackacre to B, A and B are tenants in common as to the minerals. Also, if X by a mineral deed conveys an undivided one-half interest of Blackacre's minerals to Y, X and Y are also tenants in common as to the minerals. Both parties have an equal right to go upon the land and drill for or mine minerals. Both would have to sign an oil and gas lease in order for the lessee to get a good title to all the mineral interests in Blackacre and be authorized to drill. Each would be entitled to share equally in the bonuses paid for the oil and gas lease, as well as the delay rental payments made under such lease. Finally, in event of discovery of oil or gas as between the two, they would share equally in the royalty payments made under the oil and gas lease.
It is also well settled that in such a mineral deed or reservation of the grantor may convey or reserve certain attributes of this mineral ownership. Thus, in a mineral deed the grantor may convey an undivided mineral interest, but reserve unto himself all bonuses or delay rentals, or both, as to any oil and gas lease. Mounger v. Pittman, 235 Miss. 85, 108 So.2d 565 (1959), infra. Ford v. Jones, 226 Miss. 716, 85 So.2d 215 (1956); Westbrook v. Ball, 222 Miss. 788, 77 So.2d 274 (1955).
Another type of mineral interest ownership is a royalty interest. This interest only becomes meaningful if there is a commercial production of oil and gas, at which time the royalty owner receives the agreed-upon fraction of the production. The owner of a royalty interest has no control or right of possession, and no obligation to the remaining mineral interest owners. And, unless or until oil or gas is produced commercially, no obligation of any kind is due him. A royalty interest does not share in the bonuses or delay rentals with the other mineral interest owners. He is not required to sign an oil and gas lease in order for the lessee to have the right to go upon the land and drill for oil and gas. His interest cannot be charged with any costs of drilling a well as it could be if he held a mineral interest as a tenant in common and his cotenant drilled a producing well. Lackey v. Corley, 295 So.2d 762 (Miss. 1974).
Generally, it is quite clear just what type of ownership the parties have. A conveyance or reservation of a royalty interest will, as a rule, specifically state that the royalty owner has no right to sign oil and gas leases, and that he cannot participate in bonuses or delay rentals, and cannot be charged with drilling or exploration costs.
In this case we have a mineral deed which reserved to the grantors the rights to bonuses and delay rentals under any oil and gas leases. Did this reservation so change the character of the instrument from a mineral deed to transform it into a royalty conveyance? We hold it did not.
In the evolution of oil and gas law in this state, our courts have endeavored to accommodate to the practical needs of the parties involved with the end in view of *986 promoting the development of our natural oil and gas resources as efficiently as possible commensurate with fairness to all parties. The words used to denote mineral ownership have occasionally had fuzzy edges. We could, of course, hold that certain words have a definite, fixed meaning at all times and under all circumstances. Circumstances occasionally show, however, that the parties did not mean what the words standing alone might appear to mean. We therefore have had to look to surrounding circumstances in addition to relying upon the words themselves. In such instances we deemed it better to let the words remain just what they are: a strong, but not necessarily conclusive indication of what the parties meant.
Here again we are confronted with the same problem. We are asked to determine whether an instrument is a mineral deed, conveyance of a "mineral estate" of the "minerals in place," or a conveyance of a "non-participating royalty interest"? As stated in Hemingway, Law of Oil and Gas:
In probably no other area of oil and gas law, than in cases involving the mineral-royalty distinction, can examples be found of courts, on behalf of befuddled litigants, benevolently and improperly granting reformation in the guise of a judgment for title.
Section 2.7 (2nd Ed. 1983).
The chancellor's problem in this case was a consequence of our decision in Harris v. Griffith, infra, wherein we benevolently took care of "befuddled litigants" to let their words accommodate what we thought the parties intended. Before discussing Harris v. Griffith, we will give a case history of how this question has evolved in this state.
In McNeese v. Renner, 197 Miss. 203, 21 So.2d 7 (1945), this Court recognized that minerals and land could be owned separately or concurrently, and that a reservation of "an undivided one-fourth interest in and to all minerals" reserved to the grantor a present undivided one-fourth interest in the minerals. We held the grantor owned his interest as a tenant in common with the grantee, carrying with it a right to enter the land and explore for minerals.[1]
This state has been long committed to the position that minerals, though undiscovered, could be owned "in place."
In Gulf Refining Co. v. Stanford, 202 Miss. 602, 30 So.2d 516 (1947), this Court noted that Mississippi was one of a group of states recognizing this type of ownership in minerals. We held, however, when the grantor wrote in his deed that "in the event of any minerals, oil or gas being found in the bounds of the land we are to share the profits equally," he did not reserve an undivided interest in the minerals. Rather, the deed showed an intent of the parties that upon discovery of oil the grantor and grantee would equally share the profit when oil was brought to the surface. Therefore the grantor would only share equally with the grantee in the royalty paid under an oil and gas lease executed by the grantee. It is interesting that two members of our then six-member Court sharply dissented, contending even this reservation entitled the grantee to an undivided one-half interest in the minerals in place.
In Palmer v. Crews, 203 Miss. 806, 35 So.2d 430 (1948), 4 A.L.R.2d 483, we construed a holographic will of C.C. Crews, a Texas testator. Crews had many years experience in oil exploration and owned mineral interests in Texas, Louisiana and Mississippi. He bequeathed his wife a life estate in "all my royalties," without restriction as to their location. He also bequeathed his "oil interests" in Texas to his brother. One of the questions facing this Court was whether the mineral interests in Mississippi acquired by mineral deeds to the testator passed under the will. We held the testator, under Texas law, would have understood the difference between a "royalty" and an undivided interest in minerals, therefore the Mississippi mineral interests were not covered by the will. As to these mineral interests, the testator died *987 intestate. We held that a devise of royalty did not embrace minerals in place acquired by deeds.
In Abney v. Lewis, 213 Miss. 105, 56 So.2d 48 (1952), Mrs. Abney executed a conventional oil and gas lease in 1939 on twenty acres of land she owned. The lease provided for a one-eighth royalty on the oil produced and one dollar per acre per year delay rentals. In 1942 she sold the tract to Lewis, subject to this specific oil and gas lease, and further stated in the deed to Lewis that "all rentals under said lease are hereby reserved and are to be paid to the grantor." Later, oil was found in this land. Recognizing the distinction between a royalty and delay rentals, we affirmed the chancellor's finding that Mrs. Abney did not reserve the royalties due under the lease, but only the delay rentals.
In Texas Gulf Producing v. Griffith, 218 Miss. 109, 141, 65 So.2d 447, 834 (1953), upon a suggestion of error, we construed a "Royalty Deed" in which the grantors conveyed a one-half interest in the minerals. The deed specifically reserved to the grantor the exclusive right to execute oil and gas leases, and all consideration and delay rentals under such leases. It also stated that the grantees would not be required to join in any such lease in order to convey a good title to the lessee. The grantors also covenanted not to execute any oil and gas lease in which the grantors would receive less than one-eighth royalty. The deed then stated that it was the intention of the parties that the grantee should receive one-half of the royalties under any oil and gas lease executed by the grantors. We held this instrument was a "royalty conveyance and not a mineral conveyance."
In Westbrook v. Ball, supra, Ball, who owned an undivided 15/16 interest in the minerals, conveyed his land to Westbrook. He specifically reserved all the minerals noting that he was retaining the undivided 15/16 interest and that the remaining 1/16 interest had been previously retained. In addition to retaining all minerals, Ball retained the right to go upon the land and explore for oil and gas. The instrument recited that the grantee would receive all cash bonuses and delay rentals on any oil and gas lease, but that all royalties payable would go to the grantor.
The question facing the Court was whether Westbrook had the right to execute an oil and gas lease. We held that the right reserved by the grantor to go upon the land and explore for oil and gas necessarily carried with it the right to execute an oil and gas lease. We further held that Westbrook, the grantee, only acquired the right to bonuses and delay rentals. We stated:
The words "royalty" and "minerals" have a well defined meaning as separate and distinct estates when one is compared to the other. Palmer v. Crews, 203 Miss. 806, 35 So.2d 430, 4 A.L.R.2d 483. The grantor in this deed not only retained the minerals, but retained the right to go upon, enter, to explore for, drill for, mine, store and remove all of said minerals at any and all times. All these rights are necessary to the execution of an oil, gas, and mineral lease, and where minerals are reserved these rights are necessarily implied even though not specifically reserved. McNeese v. Renner, 197 Miss. 203, 21 So.2d 7. However, in this deed all were reserved. A royalty owner has none of these rights but only has the right to share in the minerals when produced. The owner of minerals has the right to execute oil, gas and mineral leases, selecting the lessee and fixing the terms of the lease, and to receive therefrom the bonuses, delay rentals and royalties. All these rights are transferable and a grantor can transfer all of them, or only part of them, but in reserving the minerals, all are retained that are not specifically granted. Appellee reserved the minerals and it was only specified that the bonuses and rentals from any lease executed would go to appellant. [Emphasis added]
222 Miss. at 790-791, 77 So.2d at 275.
Ford v. Jones, supra, construed a "Form R-101" mineral deed such as we have in this case, conveying an undivided one-fourth mineral interest. Typed into the *988 instrument were the following two paragraphs:
It is the intention of grantors, by this instrument, to convey and the intention of grantee to purchase an undivided ten (10) royalty acres under the above described lands.
It is understood and agreed that this land is now subject to an outstanding oil, gas, and mineral lease and grantee waives the right to receive any part of the delayed drilling rentals as provided in said lease.
226 Miss. at 718-719, 85 So.2d at 216.
We held the grantee acquired an undivided one-fourth interest in the minerals in place, with all rights of ownership incident to such ownership, except the delay rentals due under the outstanding oil and gas lease, which would be paid to the grantors.
We concluded with this statement:
It is well-settled that grantors and grantees in oil, gas and mineral deeds may separate in their conveyances the several interests constituting a mineral estate. (citing Westbrook v. Ball, supra)
226 Miss. 722, 85 So.2d at 218.
In Holifield v. Perkins, 233 Miss. 876, 103 So.2d 433 (1958), there was a transfer of one-half mineral interest on a Texas form, which had written thereon: "This sale does not include any part of the delay rentals on the present oil lease on this property or on future leases."
Following conventional rules of construction,[2] we held that there was excluded from this conveyance only the delay rentals from the outstanding oil and gas lease and any future oil and gas leases. Again, recognizing the severability of incidents of ownership in a mineral interest transfer, we held bonus payments under any oil and gas lease were not excluded from the transfer and the grantor had no right to them.
In Mounger v. Pittman, supra, we recognized that particular words in a mineral transfer should not control, but the entire instrument should be examined. We held the reservation to be of a mineral interest in place as opposed to a royalty interest. The reservation read as follows:
We do hereby reserve for ourselves, our heirs and assigns, one-eighth of all the oil and gas which may be produced from said lands to be delivered in tanks and pipelines in the customary manner, and this shall be a covenant running with the land and all sales and other conveyances of said lands shall be subject to this reservation and agreement.
235 Miss. at 86, 108 So.2d at 566.
We then stated:
The distinguishing characteristics of a non-participating royalty interest are: (1) Such production is not chargeable with any of the costs of discovery and production; (2) the owner has no right to do any act or thing to discover and produce the oil and gas; (3) the owner has no right to grant leases; and (4) the owner has to receive bonuses or delay rentals. Conversely, the distinguishing characteristics of an interest in minerals in place are: (1) Such interest is not free of costs of discovery and production; (2) the owner has the right to do any and all acts necessary to discover and produce oil and gas; (3) the owner has the right to grant leases; and (4) the owner has the right to receive bonuses and delay rentals.
235 Miss. at 86-87, 108 So.2d at 566.
In Rogers v. Morgan, 250 Miss. 9, 164 So.2d 480 (1964), we construed a royalty conveyance, in which the grantor specifically reserved bonuses, delay rentals and the right to execute oil and gas leases on the land. Although called upon to do so, we did not address the question of whether the holder of executive rights had a fiduciary duty to protect the interest of all owners.
In Payne v. Campbell, 250 Miss. 227, 164 So.2d 780 (1964), we construed a royalty deed in which the grantee claimed to own an undivided one-half interest in the *989 minerals in place. The first paragraph of this conveyance read:
One-half (1/2) of the whole of any oil, gas or other minerals, except sulphur, on and under and to be produced from said lands; delivery of said royalties to be made to the purchaser herein in the same manner as is provided for the delivery of royalties by any present or future mineral lease affecting said lands.
250 Miss. at 233, 164 So.2d at 782.
The remainder of the conveyance made it clear that the grantor reserved all executive rights, and the right to collect all bonuses and delay rentals from oil and gas leases.
We considered the deed as written, the consideration paid for the conveyance, and the situation of the parties at the time of the conveyance. The chancellor found that the grantee only acquired an undivided one-half interest in the one-eighth royalty paid the lessor under any oil and gas lease. We affirmed the chancellor's finding because it was the only reasonable interpretation which could be made under the circumstances.
The mineral deed in this case is on a form customarily used to convey a mineral estate with all appertaining rights as opposed to a royalty interest only. The only change made in the terms and conditions of the printed form is the typed insertion that the grantee would not receive bonuses or delay rentals from any oil and gas lease. Under conventional rules of construction, this appears a simple conveyance of an undivided one-half interest in all the minerals, with the grantor retaining the right to bonuses and delay rentals from oil and gas leases. Under our decisions in Westbrook v. Ball, Ford v. Jones, and Mounger v. Pittman, supra, it is well settled these rights could be separated without changing the character of the instrument from a mineral estate to a royalty interest only.
Also, under ordinary rules of construction, all that was not unequivocally and specifically reserved was conveyed by the granting clause. Holifield v. Perkins, supra; Oldham, et al. v. Fortner, et al., 221 Miss. 732, 74 So.2d 824 (1954); The Texas Co. v. Newton Naval S. Co., 223 Miss. 468, 78 So.2d 751 (1955).
Harris v. Griffith, supra, is the only case from this Court which, arguably, could support a contrary conclusion. That case, however, is distinguishable on its facts from this case. In 1937 the Griffiths executed an oil and gas lease. In August, 1944, they executed a mineral conveyance on a "Form R-101," as used in this case, conveying an undivided one-quarter interest in the minerals to Thomas O. Payne. Typed in this deed (in addition to the land description) were the following sentences:
It is the intention of the grantors herein to convey 64 3/4 full mineral acres.
This instrument is to be non-participating both as to bonuses and lease rentals.
210 So.2d at 631. Also, the following changes were made in the deed. In the heading the word "RIGHT" was marked through and "DEED" typed in capital letters above it. In the final conveying paragraph, all but the following first sentence thereof was marked out:
This conveyance is made subject to any valid and subsisting oil, gas or other mineral lease or leases on said land, including also any mineral lease, if any, heretofore made or being contemporaneously made from grantor to grantee.
210 So.2d at 631.
In Griffith we also noted there were elements of estoppel against the parties who claimed to own a mineral interest as opposed to a royalty interest. They had paid none of the production costs for the producing well, and had not asserted any more than a royalty interest when the Griffiths had to employ an attorney, (and pay him forty percent of their mineral estate) to secure a release of an oil and gas lease from the oil company which had shut down production. When another operator took over drilling operations, over $34,000 in debts attributable to this tract had been paid by the complainants. The final operator produced a commercial well. Thereafter, in 1960 (and notarized in 1966) the defendants executed an oil and gas lease to a third party. The complainants sought to cancel the oil and gas lease as a cloud upon *990 their title. The chancellor held the deed to Payne was only a non-participating royalty interest and that all executive rights, bonus and delay rentals remained with the grantor.
In Harris this Court first stated that parol evidence concerning the effect of the deed was not competent, because of the need for a consistent, coherent body of law on the construction of oil and gas conveyances. We added that ordinarily such instruments are not regarded as ambiguous, and that courts should construe them so as to best comport to the parties' intention appearing on the instrument itself. We quoted with approval Richardson v. Moore, 198 Miss. 741, 22 So.2d 494 (1945):
In trying to solve this question, we should keep in mind certain well-established principles of construction of contracts. Those applicable here are (1) the deed must be read in the light of the circumstances surrounding the parties when it was executed; (2) that the construction should be upon the entire instrument, and each word and clause therein should be reconciled and given a meaning, if that can be reasonably done; (3) that the main document and that to which it refers must be construed together; (4) that if the wording of the deed is ambiguous, the practical construction placed thereon by the parties will have much weight in determining the meaning * * *.
210 So.2d at 633.
We then stated:
Accordingly, the Griffith-Payne deed should be analyzed in the light of the objective circumstances surrounding the parties when it was executed. Moreover, the construction must be upon the entire instrument.
210 So.2d at 633.
This Court recognized that the printed form was used to convey a fractional interest in minerals in place. We then noted that the parties showed an intent to substantially change the form to the effect the interest conveyed. We first noted that the heading had been changed, and that this change indicated an intent to convey a royalty only. We also considered the typed intention clause: "This instrument is to be non-participating both as to bonuses and lease rentals." We held this as indicative of an intent to convey something other than an interest of minerals in place and that the retention of bonuses and delay rentals was closely and materially related to the executive right. Considering the deed further, we noted the parties struck out the last printed paragraph:
... but for the same consideration herein above mentioned, grantor has sold, transferred, assigned and conveyed and by these presence does sell, transfer, assign and convey unto grantee, his heirs, successors and assigns, the same undivided interest (as the undivided interest herein above conveyed in the oil, gas and other minerals in said land) in all the rights, rentals, royalties and other benefits accruing or to accrue under said lease or leases from the above-described land; to have and to hold unto grantee, his heirs, successor and assigns.
210 So.2d at 634.
We held that the striking of the above-quoted provision tended to show that the parties did not intend to sell the rights, rentals, royalties and other benefits under the existing lease. We then stated:
The deletions in the title and the last printed paragraph may be considered in order to arrive at the true meaning and the intention of the parties. They are relevant factors under the circumstances of this case and the terminology of the deed in assisting the Court to reach a reasonable interpretation of the instrument.
* * * * * *
In the instance case, the reservation of bonuses and rentals, together with the other above-discussed terms of this deed, constituted an implied retention of the executive rights. [Emphasis added]
210 So.2d at 635.
We were also influenced by the fact that, as in this case, Payne, the grantee, was an experienced oil and gas investor, whereas Griffith, the grantor, lacked experience and *991 education. Finally, this Court took into account the timing and long period of delay by the lessors under the 1960 oil and gas lease before they asserted any claim to the executive right.
There are two additional amendments to the printed form in Harris v. Griffith, not present in this case. Also, as we noted above, the defendants in Harris v. Griffith did not deem themselves to be tenants in common with the grantors when the grantors had to employ legal counsel to secure a release of an oil and gas lease, and the defendants paid none of the legal fee. See: 86 C.J.S. Tenancy in Common, § 68(d), p. 452, and cases cited. Further, the defendants had assumed none of the expenses or costs when the previous drilling had far more expense than income. As tenants in common, their interest would have been chargeable with a proportion of such costs. Mounger v. Pittman, supra, 108 S.Ct. at 566. Lackey v. Corley, 295 So.2d 762 (Miss. 1974). See also: Martin v. Humble Oil and Refining Co., 199 F. Supp. 648 (N.D.Miss. 1960), affirmed 298 F.2d 163 (5th Cir.1961), rehearing denied 301 F.2d 313 (5th Cir.1962); P & N Investment Corp. v. Florida Ranchettes, Inc., 220 So.2d 451 (Fla. Dist. Ct. App. 1968); Shaw & Estes v. Texas Consolidated Oils, 299 S.W.2d 307 (Tex. Ct. App. 1957); White v. Smyth, 147 Tex. 272, 214 S.W.2d 967, 5 A.L.R.2d 1348 (1948); Little v. Mountain View Dairies, 35 Cal.2d 232, 217 P.2d 416 (1950).
The circumstances and facts of that case caused this Court to make an exception of what otherwise would unquestionably have been termed a conveyance of mineral interest in place, and not simply a conveyance of a right to royalties. Those circumstances and facts are not present in this case.
In this case the chancellor found no element of estoppel and noted the parties had not struck any of the printed portion of the mineral deed.
In our original opinion, because we found Harris v. Griffith clearly distinguishable (despite the very able dissenting opinion), we saw no necessity to consider overruling it.
The extensive briefs filed by the parties in connection with the petition for rehearing, as well as the views expressed in the dissenting opinion, however, have convinced us that Harris v. Griffith needs to be overruled, insofar as this Court construed that the instrument therein by its terms conveyed only a non-participating royalty. We are convinced that in this respect the Court erred, and that the instrument by its terms remained, despite the changes noted by the Court, a conveyance of an undivided one-half interest in the oil and gas minerals, subject only to a reservation in the grantors of the bonuses and delay rentals.
Harris v. Griffith was cogently criticized in an article published in Volume XLI, Mississippi Law Journal, Spring 1970, No. 2, p. 189, "An Analysis of the Rights and Duties of the Holder of the Executive Right," Joel Blass and Jean Rand Richey, pp. 201-205. The authors were of the view this Court erred in finding that the reservation of bonuses and delay rental "justifies the implication of an intent to retain the executive right in the grantor." They further contended this was at variance with our consistent holdings that the various incidents of ownership in a mineral estate could be separated, Westbrook v. Ball, supra, and the conventional rule of construction that in a conveyance of a mineral estate all is conveyed that is not specifically reserved or excepted, p. 204. The confusion the authors predicted would result from this decision have indeed come to pass. We have therefore concluded that Harris v. Griffith, while containing sound pronouncements of law, nevertheless erred in concluding that there was an implication of a reservation of executive rights simply by a reservation of bonuses and delay rentals. Our view is precisely the reverse: that the grant of an entire interest in minerals conveys all incidents of ownership thereto that are not specifically excepted or reserved, and that the reservation by the grantor of all rights to bonuses and delay rentals from oil and gas leases does not carry with it by implication executive rights, or any other incident of ownership.
*992 We therefore overrule Harris v. Griffith insofar as it holds that an instrument such as there executed does not on its face convey an undivided one-half interest in the minerals with all rights incident thereto, with the sole exception of the reservation in the grantors of the rights to receive bonuses and delay rentals from oil and gas leases.
We must hold, therefore, that the chancellor erred in holding this conveyance to be a non-participating royalty transfer rather than of an undivided one-half interest in the minerals.
The conveyance to Thornhill was of an undivided one-half interest of the oil and gas minerals, reserving only to the grantors the right to bonuses and delay rentals from the existing and future oil and gas leases. Executive rights were not reserved. The decree of the chancery court will be reversed and judgment rendered here for the appellants.
REVERSED AND RENDERED.
HAWKINS, P.J., and PRATHER, SULLIVAN and ANDERSON, JJ., concur.
DAN M. LEE, P.J., ROY NOBLE LEE, C.J., and GRIFFIN and ZUCCARO, JJ., dissent.
ROBERTSON, J., concurs in denial of petition for rehearing with separate written opinion.
*993 
*994 DAN M. LEE, Presiding Justice, dissenting:
The original appeal of this case was from the Chancery Court of Jefferson Davis County, Mississippi. On September 9, 1987, this Court reversed the lower court and rendered judgment for appellants, C.L. Thornhill et al. To that decision I vigorously dissented. The appellees filed a Petition for Rehearing, hoping to illustrate the majority's error. In reviewing this petition, this Court again is asked to construe a "Form R-101 Mineral Right and Royalty Transfer" which contains the following type-written phrase:
Northwest 1/4 of Southwest 1/4, Section 30, Township 5 North, Range 17 West, containing 40 acres more or less. It is the intention of the grantors to convey, and they do hereby convey twenty (20) full mineral acres out of said tract.
Non-participating as to present or future lease rentals or bonuses.
Specifically, we are called upon to determine what effect "non-participating as to present or future lease rentals or bonuses" has upon the conveyance. Did the McLeods convey a mineral interest or a royalty interest? Did Thornhill buy a mineral interest or a royalty interest? By holding that Thornhill bought mineral rights in 1945, the majority, and the concurring opinion, trample upon several well established areas of the law, including deed construction, appellate review, and most fundamentally, basic oil and gas law. In so trampling, the majority has found it necessary to overrule our decision in Harris v. Griffith, 210 So.2d 629 (Miss. 1968), insofar as that opinion holds that retention of bonuses and delay rentals by the grantor necessarily implies retention of executive rights. Contrary to the opinion of the majority that Harris is some sort of aberration from our well established oil and gas law, Harris did what this Court has failed to do here  it applied our well established principles of deed construction, appellate review and basic concepts of oil and gas law. With all due respect to the majority, again I vigorously dissent, both to the holding in the present case and to the overruling of Harris.

FACTS
Hardy McLeod and Josephine McLeod owned the northwest quarter of the southwest quarter of Section 30, Township 6 North, Range 17 West, in Jefferson Davis County, Mississippi. On September 9, 1944, the couple executed an oil, gas and mineral lease covering the land in favor of Frank Ryba. Thereafter, on May 14, 1945, the McLeods executed a mineral right and royalty transfer to C.L. Thornhill. This instrument appeared on a standard "Form R-101 Mineral Right and Royalty Transfer." On the face of the deed is typed "it is the intention of the grantor to convey and they do hereby convey twenty (20) full mineral acres of land of said tract. Non-participating as to present or future lease rentals or bonuses."
On July 28, 1948, four years after the mineral conveyance to him, Thornhill filed an application for ad valorem tax exemption on his interest acquired from the McLeods. Paragraph 4 of the printed form stated "fractional interest for which exemption is applied and nature of such interest... ." Following this is typed "one-half royalty."
On December 22, 1979, appellee, System Fuels, Inc., spudded the A.M. Speights 30-13 Well on a 160-acre unit encompassing this 40 acres. The Speights well began producing oil on March 20, 1981. On November 11, 1980, System Fuels spudded the Gas Unit 30-12 on the tract, which began producing on February 6, 1981.
C.L. Thornhill and those claiming through him, the appellants here, filed suit in the chancery court alleging the McLeods, by the instrument in question, conveyed a one-half mineral interest in all minerals in place, subject only to the reserved right of the grantors to receive all bonuses and delay rentals from the oil and gas lease in effect when the instrument to Thornhill was executed, as well as to all future oil and gas leases. The appellees, System Fuels, Inc., and others, answered, denying such ownership, and claiming that all Thornhill acquired by such conveyance *995 was a non-participating royalty interest in the oil and gas produced, which carried with it no right to execute oil and gas leases on the land.

I.

Some Basic Oil & Gas Law
In the "objective accessible world," of which the concurring opinion is much enamoured, but which both the concurring and the majority opinions ultimately ignore, the McLeods owned the surface and minerals of the 40 acres. In 1944, the McLeods leased their 40 acres in minerals to Frank Ryba. In 1945, the McLeods conveyed 20 full mineral acres to Thornhill; however, in the typed-in portion of the mineral deed, the McLeods retained the rights to all present and future bonuses and lease rentals. Appurtenant to ownership of minerals is the right to bonuses and delay rentals, along with the right to execute leases. The effect, then, of retaining the rights to bonuses and lease rentals turned what started out to be a mineral conveyance into a royalty deed. The reason this is so is because two of the rights appurtenant to ownership of minerals were retained by the McLeods, bonuses and delay rentals. But what of the right to execute leases? The right to receive bonuses and delay rentals are necessarily appurtenant to the right to execute leases. In order to understand why this is so, it is necessary to understand what a bonus is. A bonus is the cash consideration paid by the lessee for the execution of an oil and gas lease by the mineral owner. 7 Williams & Myers, Oil and Gas Law, Manual of Oil and Gas Terms 80. It is true that the bonus can take some other form than cash  it can be a royalty bonus or overriding royalty reserved to the mineral owner in addition to the usual mineral owner's royalty. But a bonus by any other name is still a bonus, and its purpose is to compensate the mineral owner for executing a lease.
Where the majority opinion fails in this case is when it plays a theoretical game of separating the right to execute a lease from the consideration a mineral owner is paid to execute the lease. Here, the majority says that because McLeod, in an instrument which Thornhill drew up, did not expressly retain the right to execute leases on 20 acres, the right went to Thornhill, but McLeod is still entitled to receive the bonuses on any lease Thornhill executes on the other one-half of the mineral estate. Why in the world would Thornhill want the right to execute leases while allowing the McLeods to retain the bonuses from a lease he, Thornhill, executes, when the whole purpose of the bonus is to compensate the lessor for executing the lease? In the "objective accessible world," an experienced oil and gas person, as Thornhill was, would not do that unless he, too, were playing games with the inexperienced McLeods. Furthermore, under today's majority opinion, if Thornhill executes a lease on his 20 mineral acres and there is delay in drilling, the delay rentals on Thornhill's lease would also go to the McLeods. Why would Thornhill do that?
The point is that the "executive right" the majority creates today is no more than a legal theory. An executive right unhinged from the bonus is meaningless, because by definition whoever retains the right to execute leases has the right to the resulting bonus. The bonus is nothing more, or nothing less, than consideration paid for executing a lease. Harris v. Griffith, 210 So.2d 629 (Miss. 1968), was infinitely correct, in the real world, when it held that the retention of bonuses and lease rentals justifies an implication to retain the right to execute leases. Harris at 634. It is the only implication that makes any practical sense. Otherwise, both the grantor and the grantee are left with meaningless rights.
For example, consider the following two scenarios. If the McLeods are entitled to the entire bonus on the property but have only a right to lease one-half of the property, as is the case under the majority opinion, then the McLeods' interest in the entire bonus is in effect limited to a one-half interest in the bonus if Thornhill should refuse to lease. Why would a grantor in the real world so limit his interest? In scenario two, Thornhill is left with a meaningless *996 right as well. Under the majority opinion, Thornhill is vested with the right to bargain with and contract with a lessee for a lease covering his 20 mineral acres; however, the right to receive the cash bonuses and delay rentals is vested in the McLeods. No matter how hard a bargain Thornhill may drive with the lessee as to cash bonuses and delay rentals, nothing will inure to his benefit, because the bonus and delay rentals go to the McLeods. What can Thornhill do? He could perhaps refuse to bargain for a lease that provides for a cash bonus and delay rentals and instead negotiate for a paid-up lease for an excess royalty. But, Thornhill's duty of good faith and fair dealing to the McLeods under the conveyance dictate that he turn over the excess royalty to the McLeods  a bonus by any other name is still a bonus. So, Thornhill has no personal incentive to drive the hard bargain for a lease. In either scenario, the McLeods are potentially deprived of the very benefits, bonus and rentals, they expressly reserved in the conveyance.
The avoidance of these problems formed the underlying rationale in Harris and that rationale did not, nor does not, stand alone in oil and gas jurisprudence. See, e.g., Hudgins v. Lincoln National Life Insurance Co., 144 F. Supp. 192 (E.D.Tex. 1956); McVey v. Hines, 385 P.2d 432 (Okl. 1963); Ledoux v. Voorhies, 222 La. 200, 62 So.2d 273 (1952); Skelly Oil Company v. Cities Service Oil Company, 160 Kan. 226, 160 P.2d 246 (1945).
I further point out that Harris is no aberration from our previous decisions on oil and gas questions. In fact, Harris was the first case in which this Court had to decide the precise question of whether or not the right to execute leases follows the right to receive bonus and delay rentals where the conveyance expressly retained in the grantor the bonus and delay rentals but was silent as to the right to execute leases. In deciding the question, the Harris Court applied long established principles of oil and gas law and deed construction.
The similarities between this case and Harris are striking. Attached to this opinion is a copy of the conveyance in Harris. A copy of the conveyance from the McLeods to Thornhill, the subject of today's case, is also attached for comparison purposes. The same "Mineral Right and Royalty Transfer" form was employed in both cases. Considering this form, the Harris Court commented:
The parole evidence offered by appellees, as to conversations between Griffith and Payne before execution of the deed, and the inquiries of Griffith concerning the effect of the deed as changed, was not competent. Parol evidence of this nature is not ordinarily admissible in the construction of a mineral deed. Because of the need for a consistent, coherent body of law on this subject, ordinarily such instruments are regarded as unambiguous, and a construction is placed upon them that will best comport with the parties' intention appearing from the instrument itself. Williams & Meyers, Oil & Gas Law, §§ 219.4, 204.10, at 501 (1964). [emphasis added]
Harris, 210 So.2d at 633.
Furthermore, the Harris Court employed long established principles of contract construction first outlined in Richardson v. Moore, 198 Miss. 741, 749-50, 22 So.2d 494, 495 (1945):
(1) the deed must be read in the light of the circumstances surrounding the parties when it was executed; (2) that the construction should be upon the entire instrument, and each word and clause therein should be reconciled and given a meaning, if that can be reasonably done; (3) that the main document and that to which it refers must be construed together; (4) that if the wording of the deed is ambiguous, the practical construction placed thereon by the parties will have much weight in determining the meaning... .
Harris at 633. Of the "Mineral Right and Royalty Transfer" form, the Harris Court stated: "This form has been in use in this state for a long time. It is well known that unchanged it has the effect of conveying a fractional interest in the minerals in place. See Ford v. Jones, 226 Miss. 716, 85 So.2d *997 215 (1956); Gulf Refining Co. v. Harrison, 201 Miss. 294, 28 So.2d 221, 30 So.2d 44, suggestion of error overruled, 201 Miss, 294, 335, 30 So.2d 807 (1947); Cummings v. Midstate Oil Corp., 193 Miss. 675, 9 So.2d 648 (1942)." Harris at 633-34. However, the parties to the conveyance in Harris, as in today's case, made changes on the form. "They clearly intended to change in a substantial way the effect of the instrument." Harris at 634. Speaking of the parties' intent, the Harris Court noted:
Payne, an experienced oil and gas investor, must have been well aware of the significance of the form used, and must have intended material alterations in its effect. In short, the parties were unwilling to use the regular printed form, which would have conveyed to Payne the minerals, including the executive right.
Harris at 634. Thornhill, in this case, as was Payne in the Harris case, was an experienced oil and gas investor, and by making the changes in the conveyance form, must have intended at the time the conveyance was executed, to receive a royalty interest. Thus, as Harris pointed out:

A non-participating mineral interest is in substance a royalty interest. This deed does not create a non-executive mineral interest, which is defined as the right to royalty and to either bonus or rental, or both, under existing or future leases, the owner of which has no development right and no executive right. Bonus or rental in the present deed were not conveyed. 1 Williams & Meyers, Oil & Gas Law, § 301 at 441 (1964) [emphasis added]
Harris at 634. Summarizing, then, the effect of the conveyance, Harris states:
The printed granting clause, on its face, conveyed a 1/4 mineral estate. However, when considered along with the "non-participating" clause ... an intent to make the interest conveyed non-participating is significantly indicated. Moreover, the retention of bonuses and lease rentals under these circumstances justifies the implication of an intent to retain the executive right in the grantor. They are closely and materially related to the executive right. The latter may be separated, but this should be done explicitly.

Harris at 634. And then, the Court in Harris hit the nail squarely on the head when it said:
The potential difficulties from an opposite approach are illustrated in the instant case. Mesdames Crain and Griffith executed the purported lease on their 1/8 interest to Harris without receiving any bonus, but instead took an overriding royalty. Yet Griffith, clearly entitled under the deed to receive lease bonuses, is deprived of any such benefit under the Harris lease. This is not consistent with a duty of good faith and fair dealing by the owner of the executive right.

Harris at 634 [emphasis added].
The Harris Court, then, clearly recognized these potential problems, problems that will now arise under today's majority opinion in the McLeod lease, as discussed above.
The cases cited by the majority that led up to the Harris decision construed other limitations on oil and mineral conveyances, but did not address the precise issue before the Harris Court and before us today  does the right to execute leases follow the right to a bonus? It must, by virtue of the plain meaning of a bonus. Harris correctly applied basic concepts of oil and gas law to decide the issue and cannot, therefore, be a case that stands outside our precedent, as the majority claims.

II.

Some Principles of Deed Construction
The majority arrives at its theoretical separation of the right to execute leases from the right to a bonus by ignoring several principles of deed construction. In the first place, when a written or type-written provision of an instrument cannot be reconciled with the printed provisions, the written provision controls. Holifield v. Perkins, 233 Miss. 876, 880, 103 So.2d 433, 434 (1958); Ford v. Jones, 226 Miss. 716, 720, 85 So.2d 215, 217 (1956); Dale v. Case, 217 *998 Miss. 298, 308-10, 64 So.2d 344, 346 (1953). Applying this principle to this case, the conveyance by the McLeods of one-half of their minerals was modified by the typed-in portion. Two of the rights appurtenant to the ownership of the minerals were retained by the McLeods. Further, applying the principle analyzed above  that the right to execute leases must necessarily obtain to the right to a bonus  all of the rights appurtenant to owning the minerals stayed with the McLeods. Therefore, by this conveyance Thornhill did not participate in any of the rights appurtenant to owning minerals; he received the right to share equally in any royalty the McLeods retained in any leases, and that is all he received. He received a royalty deed. Harris applied this long established principle of deed construction when it determined that such a conveyance amounts to a royalty deed, as pointed out above. Harris is no aberration in this respect.
Second, the majority ignores the proper method for separating the rights appurtenant to ownership of minerals. Harris stated, as pointed out above, that "[t]hey [bonuses and rentals] are closely and materially related to the executive right. The latter may be separated, but this should be done explicitly." Harris at 635. This principle arose from Westbrook v. Ball, 222 Miss. 788, 791, 77 So.2d 274, 275 (Miss. 1955), where this Court said that the right to execute leases and receive bonuses, rentals and royalties are transferrable, but all are retained that are not specifically granted. The McLeods did not convey the right to execute leases; therefore, they retained that right. Furthermore, Thornhill would not participate in any bonuses or delay rentals obtained from any leases the McLeods may execute. This reading of the conveyance, then, leaves Thornhill with a royalty interest, a reading that consistently applies our long held rules of deed construction. The Harris opinion is no aberration on this point, either.
Third, the majority opinion finds this conveyance to create an ambiguity, contrary to the chancellor's findings, and then proceeds to ignore the principles we have applied to construing ambiguous instruments. In Clark v. Carter, 351 So.2d 1333 (Miss. 1977), this Court wrote:
Although the terms of a contract generally are construed more strongly against the grantor or maker when they are vague or ambiguous, it is also an established principle of law that such terms are construed more strongly against the party preparing the instrument.

[emphasis added] Clark at 1336. See also Stampley v. Gilbert, 332 So.2d 61, 63 (Miss. 1976); Globe Music Corporation v. Johnson, 226 Miss. 329, 84 So.2d 509 (1956); Love Petroleum v. Atlantic Oil Producing Company, 169 Miss. 259, 152 So. 829 (1934); Home Mutual Fire Insurance Company v. Pittman, 111 Miss. 420, 71 So. 739 (1916). Thornhill prepared this instrument and carried it to the McLeods for execution. If we construe this instrument more strongly against Thornhill, as we are bound to do under our precedent, we can only conclude that Thornhill, an experienced oil and gas person, knew the effect of conveying minerals but retaining in the grantor the rights appurtenant to ownership of the minerals. The effect was to create a royalty deed. Thornhill knew what he wanted to buy and knew the difference between minerals and royalty. This principle of instrument construction becomes crucial when a court is faced, as we are here, with grantors who in 1945 were elderly black people in their seventies, who could neither read nor write, and who signed the conveyance with an "X." This principle was also recognized and applied in Harris when it found that Payne, an experienced oil and gas investor, intended that the conveyance give him a royalty interest. Harris at 636.
Finally, the majority and the concurrence embrace the principle set out in Harris that courts should construe instruments so as to best comport with the parties' intentions appearing on the instrument itself. In this respect, Harris embodies principles of deed construction, as pointed out above, set out early on in Richardson v. Moore, 198 Miss. 741, 749-50, 22 So.2d 494, 495 (1945). See also Payne v. Campbell, 250 Miss. 227, 164 So.2d 780 (1964); Salem *999 Brick & Lumber Co. v. Williams, 210 Miss. 560, 50 So.2d 130 (1951). However, while paying lip service to these principles, the majority fails to apply them to this case, something in Harris we did not fail to do. The very words of the 1945 conveyance itself shows the intent of the parties, as discussed above. The typed-in portion expressly turns the mineral conveyance into a royalty conveyance. But if, as the majority claims, the instrument creates an ambiguity, we can look to the circumstances surrounding the parties when the conveyance was executed, and we can look to the practical construction the parties themselves placed upon it. What speaks volumes are two facts. First, in 1948, Thornhill acknowledged that his interest was a one-half royalty when he applied for an ad valorem tax exemption. Second, Thornhill delayed until 1979 in asserting his executive rights. The McLeods continued to execute leases covering this property in 1949, 1959, 1971, 1974, 1976, 1977 and 1979; Thornhill did not attempt to execute a lease until five months before the well was spudded in 1979. Thus, the objective circumstances surrounding this deed points strongly to the conclusion that it conveyed only a non-participating royalty interest, especially when considered in the light of the fact that Thornhill, the experienced oil and gas person, prepared the conveyance and obtained its execution from elderly, illiterate grantors. The chancellor likewise found these two facts to speak volumes and weighed them into his findings.

III.

Some Principles of Appellate Review
Finally, the majority fails to follow this Court's precedents of appellate review. Again and again we have articulated the scope of review. Early on we stated:
[E]vidence which supports or tends to support the decree, together with all inferences which may be reasonably drawn from it and which support the decree, must be accepted.
Blakeney v. Blakeney, 244 So.2d 3, 4 (Miss. 1971). Accord Culbreath v. Johnson, 427 So.2d 705, 707 (Miss. 1983). We have also stated our scope of review in terms of manifest error: It is that where the chancellor was the trier of facts, his findings of fact on conflicting evidence cannot be disturbed by this Court on appeal unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence. Even if this Court disagreed with the findings of fact and might have arrived at a different conclusion, we are still bound by the chancellor's finding unless manifestly wrong as stated above. Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978).
We combined this test into our now familiar substantial evidence/manifest error rule:
We have repeatedly refused to reverse a chancery court's finding of fact where there is any substantial credible evidence which supports it.... Put otherwise, the chancery court's findings must be allowed to stand unless manifest error is present and apparent.
Dunaway v. Busbin, 498 So.2d 1218, 1220 (Miss. 1986). Today's majority opinion steps outside our scope of review, something the Harris court did not do, to avoid the chancellor's findings of fact as a true ascertainment of the parties' intent at the time the conveyance was signed in 1945. The chancellor below made the following findings:
(1) Neither Hardy nor Josephine McLeod could read or write, and, therefore, could not have prepared the deed;
(2) The deed was prepared by Thornhill or his agent;
(3) The party who carried the deed to the McLeods for execution was familiar with what he wanted to buy and knew the difference between minerals and royalty;
(4) The deed was not ambiguous, and
(5) The deed conveyed a non-participating royalty interest. The majority obviously overlooks our precedent in connection with disturbing the chancellor's findings and ignores the fact that the chancellor, *1000 having heard the testimony of Thornhill, is in the best position to make findings of fact based on the evidence presented in this case. There is substantial credible evidence that Thornhill knew in 1945 that he bought a royalty interest in the McLeod estate, for the conveyance which he prepared states in plain language that he did not receive the rights appurtenant to mineral ownership. Moreover, considering the objective circumstances surrounding the conveyance and the practical construction both parties placed upon the conveyance for some 34 years can only lead to the same credible conclusion the chancellor came to. By stepping outside our scope of review to reverse the chancellor's findings, we render a decision today contrary to our basic principles of oil and gas law and deed construction, principles which the chancellor correctly applied to the facts before him.

CONCLUSION
The majority sees this decision as a mere interpretation of words in a deed; however, the ramifications of this decision will have troublesome effects upon Mississippi's oil and gas law, not to mention the incredible injustice we do to the grantors in this case who have relied on this conveyance for 34 years. The majority has fashioned a legal theory that has little practical meaning, except to open the door for title busters and oil sharks to feast upon the unsuspecting people unversed in the legal niceties of theories and terminology. I cannot join in the creation of such a theory. I, therefore, would hold that the deed from the McLeods to Thornhill conveyed a one-half non-participating royalty interest and affirm the chancellor's findings.
ROY NOBLE LEE, C.J., and GRIFFIN and ZUCCARO, JJ., join in this dissent.
*1001 
*1002 
*1003 ROBERTSON, Justice, concurring in denial of petition for rehearing:

I.
The result the Court decrees is the best the law affords on these facts. Occasional loose references to intent aside, the majority's painstaking review of our prior cases I find quite congenial and most useful in unmasking the phantom, Harris v. Griffith, 210 So.2d 629 (Miss. 1968), as outside the mainstream both historically and logically.
Still there is much in this case that is disturbing. There is a sincerely motivated dissent from respected colleagues whose views I do not dismiss lightly. There is an ably drafted petition for rehearing prepared by experienced and competent oil and gas counsel suggesting that we have violated long established canons of construction. Most disturbing is the suggestion that we speak with inconsistent voices in the field of oil and gas law, a fact which upon reflection I must concede.
In the end my concerns are twofold and related: principled integrity in our law and the practical needs of the individual and his lawyer searching the land records.

II.
Today's majority and dissenting opinions are filled with much talk of mineral estate versus royalty interest. `Tis but an object lesson that lawyers practice under a tyranny of labels.[1] All too often we yield to the tyranny when, as here, we should stand and fight.
Not that we could live without the law's labels, for all words in the end are but labels. They are inherently incapable of exact correspondence with their object. Holmes said, more metaphorically, a word is but the skin of a living thought. My targets are careless word usage and notions of mutual exclusivity.
We need not trace the tyranny of labels to its source, though in some sense it is surely educational. The form of that tyranny is mistake in function. We try to make the law's words do too much. We employ them as tools of logic when their function can be but descriptive, definitional. Words may be used to describe legal reasoning but they are without power to participate in that reasoning. We get into trouble when, as here, we try to force legal labels to exceed their capacity to assist us.
The most familiar form of the tyranny is the either/or. The matter is either this or that, with this and that being mutually exclusive categories separated by some hard-edged, case-deciding line of demarcation, or so the myth maintains. The method of the tyranny then requires forcing the case under one label or the other as though once that has been done all else will follow. Think, for example, of law versus fact,[2] of substance versus procedure,[3] of resulting trusts and constructive trusts,[4] of agents and independent contractors,[5] of sanity and insanity,[6] of direct and circumstantial evidence[7], to name but a few selected at random. And think of how we (mis)use these labels.
Today's case  and, as well, many of our recent oil and gas decisions  presents two such tyrannical dichotomies imagined distinct but in reality quite otherwise. First is *1004 mineral interests versus royalty interests.[8] Our law has long functioned through shorthand facilities that allow us to effect transfers and agreements. These are usually in the form of words or concepts which lawmakers attempt to give a clear and precise meaning.[9] Mineral interest (or estate) and royalty interest (or right) are two such terms. We have attempted to delineate what is meant by such terms in cases such as Mounger v. Pittman, 235 Miss. 85, 86-87, 108 So.2d 565, 566 (1959); and Westbrook v. Ball, 222 Miss. 788, 790-91, 77 So.2d 274, 275 (1955). Justice Hawkins' restatement of the definitions in practical common sense terms is quite valuable.
The realities represented by the labels "minerals" and "royalty" are complex. Problems arise when one speaks in terms of the underlying realities while another insists upon labeled communications. Such communication is impossible. When one talks in terms of underlying realities and the other insists upon the simplistic security of the labels, losses and often lawsuits loom large.
Our law recognizes many separate incidents of mineral ownership. Some of these are
A. The power to sell all or a part of the mineral estate.[10]
B. The authority to alienate short of sale, that is, to lease (executive right);[11]
C. The authority to go upon the land to drill and develop the minerals (right of ingress and egress).
D. The burden of participating in the cost of exploration, discovery and production;
E. The right to receive bonuses;[12]
F. The right to receive delay rentals;[13]
G. The right to receive (a part of) the proceeds of production;[14]
H. Reversionary interests, to take effect at the end of the primary term of a lease or at the cessation of production;[15] and
I. Benefit of covenants, express and implied.[16]
*1005 These incidents of ownership may be separated and conveyed or retained as the parties see fit.[17]Holifield v. Perkins, 233 Miss. 876, 880, 103 So.2d 433, 434 (1958); Westbrook v. Ball, 222 Miss. 788, 790, 77 So.2d 274, 275 (1955); Ford v. Jones, 226 Miss. 716, 722, 85 So.2d 215, 218 (1956). Nothing in our law requires that all, nor any particular combination of mineral incidents, reside in any particular party.
Listing the incidents of mineral ownership unmasks another myth. Mineral interests and royalty rights are never mutually exclusive categories. Royalty rights are one incident of a whole mineral estate. Conveyance of minerals without more conveys the right to receive royalties as well. Royalty is thus seen a subspecies of the mineral estate. It may be severed and conveyed, "participating" or "non-participating".[18]
The point is as simple as it is fundamental: the owner of a (partial or whole) mineral estate has legal power to convey to another any one or more of the various incidents of his estate  and to retain the others, as he sees fit. Oil and gas economics and custom may suggest some combinations more sensible than others. The law is indifferent to his choice.
Today's is one of those cases in which the parties broke away from the law's facilities. They laid aside the labels of convenience. The instrument at issue reserved to the grantors, Hardy McLeod and Josephine McLeod, the right to receive all bonuses and delay rentals from an eight month old oil and gas lease then in effect and, as well, from all future oil and gas leases. Once they did this, the parties moved beyond the shorthand descriptives "mineral interest" and "royalty interest." It became positively dangerous to continue to speak in those terms, as this lawsuit certainly demonstrates. Those who ask after that point whether a mineral interest or a royalty interest was conveyed by McLeod to Thornhill are simply asking the wrong question. Here lies the fundamental error of Appellees, System Fuels, Inc., et al., and of my colleagues in dissent.
Our question is, which of the incidents of mineral ownership were conveyed to Thornhill on May 14, 1945, and which were retained in the McLeods? More precisely, the judicial mind has become charged to locate the authority to lease the oil and gas interest conveyed to Thornhill.[19] Was that authority retained by the McLeods or conveyed to Thornhill?
The majority opinion, as much as I agree with it, makes the same mistake as everyone else, first on page 986 and at several points thereafter. The question is not, whether the McLeods conveyed "a mineral estate" or a "royalty interest only," but which of the various incidents of mineral ownership were conveyed and which were retained.
Two oft cited cases may be used to explain how we should construe mineral conveyances  and how we should not.
Mounger v. Pittman, 235 Miss. 85, 108 So.2d 565 (1959) is a case of consequence. Grantors reserved a one-eighth interest in the land pertaining to oil and gas. The question was whether grantor's interest was chargeable with one-eighth of the cost of production. The language at issue was
"We do hereby reserve ... one-eighth of all the oil and gas which may be produced from said lands. .. ."
235 Miss. at 86, 108 So.2d at 566. Everything else was conveyed to grantees. *1006 Though the matter could have been made more certain, construction is not difficult. The conveyance by its language gave grantees everything not reserved. Specifically, grantors reserved no right to drill or explore for oil and gas. They did reserve one-eighth of the oil and gas "which may be produced ...," that production, if any, to be generated by the parties with the right and authority to drill and explore. The words "which may be produced" could sensibly mean only "which may be produced by others than grantors." Grantors reserved the right to physical delivery of their one-eighth to themselves or as they might direct. From this it is a short step to reading the reservation as providing that grantors get their one-eighth without strings attached. The Mounger Court nevertheless offers careful definitions of "non-participating royalty interest" and "minerals in place". 235 Miss. at 86-87, 108 So.2d at 566. These definitions were unnecessary at the time. They have proven mischievous as they reinforce the tyranny of labels[20] and contribute to the methodology that leads today's dissenters astray.
Lackey v. Corley, 295 So.2d 762 (Miss. 1974) is wonderfully wrong and right. Grantees were not chargeable with cost of production because, as a matter of common English usage, the wording of the grant and reservation said they weren't, not because their interest was a "non-participating royalty interest." The Lackey Court reasoned wrongly that grantees' interest had "three of the four characteristics of a non-participating royalty interest," that the fourth  freedom from costs of production  would be implied to yield a "non-participating royalty interest," and that because grantees held a non-participating royalty interest they were not chargeable pro rata with cost of production. Lackey, 295 So.2d at 764-65. This is nonsense. Why go by way of China to cross the street? The shortest distance between two points is a straight line, and this is so in law and logic as in geometry. The Lackey grantees were not chargeable with cost of production because the words in the instrument, as a matter of elementary English usage, said they weren't, period.

III.

A.
I turn to the tyranny's second presence: the labels "ambiguous" and "unambiguous". These labels are productive of much mischief. Yet we have used them in construing mineral conveyances and in other contexts as a supposed means of deciding admissibility of parol or extrinsic evidence. Compounding the felony, we say such evidence then becomes an aid to identifying intent.
I will explain.
For one thing, there are in each word, phrase or expression a core of certainty and a penumbra of doubt. One shades into the other. The same wording may be clear or ambiguous depending upon the question sought to be answered.[21]
Second, there is no sharp or distinct line of demarcation between that core and penumbra. Compare McBrayer v. State, 467 So.2d 647, 648 (Miss. 1985). The reality is a continuum pointing toward clarity at one pole and ambiguity and indeterminacy at the other. Here we have an archetypal example of the tyranny of labels: two distinct, formally exclusive words, "ambiguous" and "unambiguous", used to reflect an underlying reality that is nothing but an in-between, for no word, phrase or legal rule is absolutely ambiguous or absolutely unambiguous. Yet we use these two words to decide cases, to dispense fortunes.
I have often wondered how long it will be before lawyers recognize this reality and quit phrasing their arguments in terms of whether certain wording is clear and unambiguous, on the one hand, or ambiguous, on the other, as though two separate and distinct realities were the alternatives.[22] Ambiguity, *1007 like beauty, lies in the eye of the beholder. I would jettison from our law the labels "ambiguous" and "unambiguous" as they are at best ambiguous.

B.
No notion in our law is more misunderstood and misused than that of "intent". To be sure, laws, be they public or private, do not come into being willy-nilly. The maker has in mind some purpose and purpose properly gleaned informs construction and application. What is critical is that we remember that we should seek purpose in the objective accessible world. In contracts and property, purpose or intent should be inferred from the words employed. In torts and crimes, from actions.
We are concerned here with privately made law, the May 14, 1945, instrument of conveyance executed by the McLeods and delivered to Thornhill. But this is a very special kind of privately made law. The instrument conveys an interest in land. It has been placed of public record there to be seen, examined and interpreted by third parties who have no knowledge of or easy access to the McLeods or Thornhill.
I for one am not nearly so interested in what the parties intended as in what they said.[23] In identifying what has been said, I would place enormous emphasis upon correct English definition and language usage. Ordinarily we should give an instrument that construction which makes sense to an intelligent layman familiar only with the basics of the English language. There is no guide to interpretation more reliable nor more capable of enduring.
No doubt there are exceptions which must be granted. Certain words have core legal meanings not commonly known by those unlearned in the law. I doubt the word "consideration" means the same to English teachers as to lawyers. Laymen think a tort a pastry. Moreover, a sentence should not be given an artificial "diagramed" meaning when its core idea is reasonably clear. Henderson v. State, 445 So.2d 1364, 1366-68 (Miss. 1984). Nor should mismatched subjects and verbs necessarily infect a sentence's sense. See West v. Arrington, 183 So.2d 824, 825 (Miss. 1966). Still in the overwhelming majority of cases I would accord the work of Noah Webster and the Strunk & White[24] a higher status than any judicial utterance.
The problem faced by the oil and gas lawyer is that our decisions reflect an inconsistent resort to the king's English. For example, in Miller v. Lowery,[25] 468 *1008 So.2d 865 (Miss. 1985); West v. Arrington,[26] 183 So.2d 824 (Miss. 1966); and Cook v. Farley,[27] 195 Miss. 638, 15 So.2d 352 (1943), the Court read the language in the instrument of conveyance as would a competent English teacher, all in the context of the facts appearing on the public record. Miller, West, and Cook seem correctly decided. By way of contrast, it seems to me that we missed the boat in Pfisterer v. Noble,[28] 320 So.2d 383 (Miss. 1975); Oldham v. Fortner,[29] 221 Miss. 732, 74 So.2d 824 (1954); and Wilson v. Gerard,[30] 213 Miss. 177, 56 So.2d 471 (1952). I think Pfisterer, Oldham and Wilson were incorrectly decided. I say this in the sense that in each of these latter three cases the Court engaged in various flights of fancy to ignore what common familiarity with the English language reflects.
In saying these things I am well familiar with the lawyer's itch for certainty. I have felt it. Title lawyers have it worse than others and understandably so. Yet we learn as children that the itch must be endured, that scratching only makes it worse. I have no illusion that the language of the law is certain and capable of mechanical application. This being so, I do not suggest it may be demonstrated with any such certainty that Miller, West, and Cook are right and that Pfisterer, Oldham and Wilson are wrong. My conclusions above are at most what I think may be demonstrated the better view.

*1009 IV.
What then of the so-called canons of construction? System Fuels cites many: resolve uncertainties against the party who prepared the instrument, Clark v. Carter, 351 So.2d 1333, 1334, 1336 (Miss. 1977); give great weight to the practical construction the parties have placed upon the instrument, St. Regis Paper Co. v. Floyd, 238 So.2d 740, 744 (Miss. 1970); and several others. Such sayings, to be sure, appear in our cases.[31] Recorded instruments of conveyance may not be so construed. However valid or useful these canons may be in resolving disputes regarding private, unrecorded contracts, a different conductor calls our cadence.
Again, I must explain.
Two wholly different categories of persons resort to recorded instruments of conveyance, read those instruments, and need to know meaning: (1) the parties (and those in privity with them) and (2) third parties checking the land records, seeking to understand the state of title, the location of rights and powers. What such instruments say must be the same, whichever type of party ponders meaning. The controlling realities are those practical limitations of the land records title searcher's access to information. I will not assent to assigning meaning by resort to references beyond practical access of the land records title searcher. Conversely, all within her access she is bound to know.[32]
In the context of today's case, I would ask, what in the chancery clerk's office tells of the practical construction the parties have given an instrument? How is the title searcher to determine which party prepared the instrument? At whose insistence were the typewritten additions added to the instrument? What in the land records gives a clue regarding the relative education levels of the parties? Their relative sophistication in oil and gas parlance? And how is the third party in reading the deed books to know the subjective state of mind of the grantor? The grantee?
Surely it follows intuitively that an instrument of conveyance from A to B should be held to have the same meaning when A and B are at each other's throats as when C reads it in the land records. Indeed, most lawsuits have a liberal sprinkling of involved original and innocent third parties. Hence, the rules of construction I outline above.
None of this is to say there should not be special rules for suits between original parties, e.g., estoppel, fraud, reformation, and the like. If an oil shark overreaches an innocent mineral owner to the extent that we intervene and void ill gotten gains, we do so on the basis of other law, not that words in a recorded instrument of conveyance mean something in that case other than their meaning in the normal case. We may hold Thornhill, for example, to a duty of good faith and fair dealing vis-a-vis the McLeods.[33] That duty may on certain facts prove outcome determinative. But this in no way alters meaning that ought be ascribed to the deed of May 14, 1945.

V.
Much is said about Harris v. Griffith, 210 So.2d 629 (Miss. 1968). The opinion of the Court authored by Justice Hawkins quite properly overrules Harris, though the dissent sees it sacred. We should visit Harris with some care, as much may be learned from it.
There is good in Harris. I applaud Harris' rejection of parol evidence of conversations between the parties before the execution of the deed. 210 So.2d at 633. Harris *1010 is quite sound in its insistence that the construction given such instruments of public record make no reference to such extraneous matters. Moreover, Harris insists the deed's meaning is that which may be gleaned "from the instrument itself." 210 So.2d at 633.
Harris quotes from prior decisions regarding principles of construction. Two are quite appropriate:
That the construction should be upon the entire instrument, and each word and clause therein should be reconciled and given a meaning, if that can be reasonably done; ... [and] that the main document and that to which it refers must be construed together.
210 So.2d at 633. Two others I regard problematical: that contracts be read in the light of circumstances surrounding the parties at the time of execution and that the practical construction placed upon an instrument by the parties will have weight. These principles call for parties to go beyond the public record. How is one examining the land records, charged with interpretation of instruments there found, to learn of the fact of such extraneous circumstances, much less their content?
Harris employs substantially sound methodology. In the performance of that methodology, however, the Court errs.
First, the instrument in Harris was the printed form entitled "Mineral Right and Royalty Transfer" (MMRT). The parties struck out the word "Right" and inserted "Deed", thus choosing for the title "Mineral Deed and Royalty Transfer." Harris concludes that this change "indicates an intent to convey a royalty only." 210 So.2d at 634. The point escapes me. Insertion of the word "deed" in the instrument's title suggests a conveyance of minerals, that all mineral interests were conveyed except those expressly reserved.[34] The Harris Court offers no explanation for its deduction from this change of title, and none is apparent.
Second, the Harris deed contained this new language:
This instrument is to be non-participating both as to bonuses and lease rentals.
The Harris Court offers a rather odd statement of interpretation. "This was not phrased in terms of a reservation or exception of bonuses and lease rentals." 210 So.2d at 634. Two paragraphs later the Court refers to this same clause as "the retention of bonuses and lease rentals." 210 So.2d at 634. I regard retention a synonym for reservation. See Roget's International Thesaurus § 660.12, p. 506 (4th ed. 1977).
Harris reaches new heights in judicial artificiality in its handling of the word "non-participating." First  inexplicably  the Court severs "non-participating" from the remainder of the clause: "both as to bonuses and lease rentals." Yet the language flows together. True, the phrase "this instrument" is a bit awkward. But the rest of the sentence seems quite accessible: The interest conveyed is "non-participating both as to bonuses and lease rentals." This can only mean that the grantee does not get the bonuses and lease rentals and, conversely, that the grantor retains those. The Harris Court is simply wrong when it reads this language as indicating "that the interest conveyed does not share in the right to execute leases or to explore and develop." 210 So.2d at 634.
Harris' second sin regarding this "nonparticipation" clause is worse.
It was not stated that the deed would be non-participating "only" as to bonuses and rentals.
210 So.2d at 634. [Emphasis mine]
I dare say that if the sentence were given to one hundred competent high school English teachers and each was told of the various incidents of mineral ownership and each was asked the sentence's meaning, all one hundred would answer that the interest conveyed was non-participating as to bonuses and to lease rentals and as to nothing else.
*1011 Harris correctly recognizes that the power to execute leases may be separated from bonuses and lease rentals then mysteriously adds: "but this should be done explicitly." 210 So.2d at 634. But this is exactly what occurred. Bonuses and lease rentals were separated from the other incidents of mineral ownership. The general words of conveyance elsewhere in the deed vested these other incidents in the grantee. This would seem explicit enough to my mind. It makes no more sense to require that the instrument go further and expressly provide that the executive right is conveyed than to add that the right to royalty was conveyed.
But it is said Harris has been on the books for almost twenty years and we ought respect it, right or wrong. I accept that in no area of our law is stability as important as in property law. Yet Harris should  must  does fall and for two overpowering reasons. It is inconsistent in principle with all that has gone before. And, it is demonstrably wrong.[35] The history of our law is strewn with the carcasses of cases long defended in the name of stare decisis untimately reversed by the rule of reason. Harris is destined to be such a case. I applaud today's decision to bite the bullet and cut everyone's losses.

VI.
Why, when all is said and done, does the legal power to lease an undivided one-half interest in the minerals in, on or under the NW 1/4 of SW 1/4 of Section 30, Township 6 North, Range 7 West, Jefferson Davis County reside in C.L. Thornhill, and those claiming through him?
Our answer may be found in the objective accessible world. In May of 1945, the land records reflected that the McLeods owned the minerals in, on or under a forty acre tract, subject only to an outstanding lease they had given eight months earlier. The mineral deed the McLeods gave Thornhill conveyed to him an undivided one-half of what they had, less reservations. We find this expressed in the great language of the printed form and, as well, in typed language appearing on the face of the instrument. The typed wording reads:
It is the intention of the grantors to convey, and they do hereby convey, twenty (20) full mineral acres of land of said tract.
These words are reasonably unequivocal. Because the McLeods had forty mineral acres and without specification conveyed twenty, their conveyance was of an undivided one-half interest in the entire forty. This is made clear by the typed "one-half (1/2)" insertion in the printed grant which proceeds to refer to the McLeods' interest in their forty acres. There is then no reason to read these words of grant as meaning anything other than as they provide. Subject to any exception that may follow, they create a conveyance of the whole bundle of incidents of an undivided one-half interest in the McLeods' forty acre mineral estate.
As we approach the matter of exceptions, we note our rule that
in order to except certain property out of a conveyance, which without the exception would carry all, the words of exception must be as definite as those required to convey title; and that, if they are not so, the whole property passes.
The Texas Company v. Newton Naval Stores Co., Inc., 223 Miss. 468, 476, 479, 78 So.2d 751, 753, 754-55 (1955), quoting Richardson v. Marqueze, 59 Miss. 80, 94 (1881). What affords this rule of construction its legitimacy and durability is its consistency with conventional English language meaning and word usage.
This rule in mind, we confront the typed exception clause in the McLeod-Thornhill conveyance:
Non-participating as to present or future lease rentals or bonuses.
No language suggests exclusion of any incidents of the mineral estate other than rentals and bonuses. No wording excludes anything other than rentals and bonuses *1012 "in word ... as definite as those" in the typed and printed granting clauses. The McLeods, as grantors, conveyed twenty (an undivided one-half interest in their forty) full mineral acres and reserved present or future lease rentals (delay rentals) or bonuses.
We are told the leasing power never moved to Thornhill but remained in the McLeods because the McLeods reserved the right to receive bonuses and lease rentals. The argument proceeds on two premises: first, that bonus is the payment made when a lease is given, therefore, retention of bonus is retention of the power to lease; and, second, if Thornhill has the leasing power, he might ignore the McLeods' interests by leasing for higher royalty (which he will get) and lesser bonus and lease rentals (which the McLeods will get).
The second objection helps answer the first. Bonus and rentals are not all the holder of the leasing power bargains for and receives when he grants a lease. Vastly more significant are the proceeds of production, a percentage of which the lessor will seek. If the McLeods retained the leasing power, they could prejudice Thornhill regarding his interest in the proceeds of production.
That bonus is the payment made when an oil and gas lease is signed does not necessarily imply that bonus be paid to the lessor. There is nothing irrational or illegal about mineral owners, such as the McLeods, seeing a producing well about as likely as finding the proverbial pot of gold at the rainbow's end, being quite content to let Thornhill chase that rainbow for a modest fee. This is particularly so when it is remembered that the McLeods retained one-half the minerals, a source of assurance of a share of any such pot of gold.
Recall that the first production began thirty-six years after the McLeods gave their mineral deed. They may in 1945 reasonably have regarded the prospects of production slim and none  and that a few hundred dollars coming in whenever Thornhill gave a lease of his one-half interest would be like finding money in the middle of the street, a periodic though modest bonus as Thornhill pursued the will-o-the-wisp. I find nothing nonsensical about the notion the McLeods may for such consideration have been willing to grant the leasing power to Thornhill.
There is a point I should note. The majority opinion contains in the introductory paragraphs (p. 984) the statement that:
After Thornhill received his interest, both Thornhill and the McLeods executed numerous instruments conveying fractional interests in the mineral and oil and gas leases. None of these conveyances are [sic] important to the issue before us.
I suspect an experienced title attorney would raise an eyebrow at such a claim, especially in light of the fact that the McLeods executed oil and gas leases covering the subject property in 1949, 1959, 1971, 1974, 1976, 1977, and 1979, while Thornhill executed only one lease during 35 years of ownership of his interest, that being in 1979.
Of course, Thornhill was under no obligation to lease his interest or even, for that matter, to remember that he owned any interest in minerals in Jefferson Davis County. Nor, upon reflection, is it relevant that the McLeods may have thought they retained the so-called executive right to the minerals in, on or under their full forty acres. To be sure, seven lessees from 1949 to 1979 thought they ought deal with the McLeods, but this is hardly surprising as they certainly held legal power to lease the one-half mineral estate not conveyed to Thornhill. No doubt the McLeods picked from the streets bonuses and rentals with each post-1945 lease. The McLeods got what they had retained in their conveyance to Thornhill. And this is so whether Thornhill or the McLeods themselves did the leasing.
In the end, such matters give pause. They do not, however, change meaning.
But we must still answer a second objection to today's reading. This point would have us inquire into the law regarding the duty of the holder of the leasing power to *1013 one holding the right to bonus and delay rentals. If Thornhill takes unlawful advantage of the McLeods, the latter may have a remedy. Suffice it to say that rewriting the McLeods' conveyance to imply retention of the leasing power is not among those remedies.
I return to the idea of grammatical construction. The McLeods conveyed via typed wording "twenty (20) full mineral acres". The pre-printed language reflects a conveyance of
an undivided one-half (1/2) interest in and to all of the oil, gas and other minerals.
These two provisions may only be read as conveying to Thornhill all incidents of the minerals not reserved. The only reservations are bonuses and rentals.[36] I read the instrument as would an English teacher having before her a manual of oil and gas terms. I am satisfied she would read the May 14, 1945, conveyance as vesting in C.L. Thornhill the legal power to lease his one-half interest in the minerals. Nor can I imagine a prudent title lawyer failing to advise a prospective lessee/client that before drilling, he had jolly well better get a lease from Thornhill as well as the McLeods.
I see the reading the Court gives the McLeods' conveyance the best it may be given consistent with the ideal of principled integrity in our law and, at once, the practical needs of the individual and his lawyer searching the land records. I join in today's decision denying the petition for rehearing of System Fuels, Inc., et al.
NOTES
[1] The practitioner would be well advised that mineral ownership may have entirely different meanings in different states.
[2] (1) In a deed where there are two repugnant clauses, the first must prevail, and (2) an attempted reservation is voided when repugnant to the granting clause, (3) these two rules shall not apply where the intent of the parties is plain. Also, when contractual provisions could not be reconciled, if part of the contract is in writing and part printed, the written part will prevail. Finally, it is the duty of the court to construe an instrument as written.
[1] I have uttered on this subject before. See J.L. Teel Co., Inc. v. Houston United Sales, Inc., 491 So.2d 851, 857-58 (Miss. 1986).
[2] See Hart & Sacks, The Legal Process: Basic Problems In The Making and Application of Law 373-75 (Tent.Ed. 1958); see also Frazier v. State By and Through Pittman, 504 So.2d 675, 714-15 n. 7 (Miss. 1987) (Robertson, J., concurring in part, dissenting in part); Boardman v. United Services Automobile Association, 470 So.2d 1024, 1029-30 (Miss. 1985).
[3] See White v. Malone Properties, Inc., 494 So.2d 576, 579-83 (Miss. 1986) (Robertson, J., concurring).
[4] See Allgood v. Allgood, 473 So.2d 416, 421-22 n. 1 (Miss. 1985).
[5] See Kisner v. Jackson, 159 Miss. 424, 427-28, 132 So. 90, 91 (1931).
[6] See Groseclose v. State, 440 So.2d 297, 302-06 (Miss. 1983) (Robertson, J., concurring).
[7] See Mack v. State, 481 So.2d 793, 796-97 (Miss. 1985) (Robertson, J., concurring).
[8] Jack H. Ewing has written a widely read and highly regarded article, Reservation and Exception Of Minerals In Mississippi Conveyancing, 39 Miss.L.J. 39, 50-58 (1967). That article has many merits. Still, the author submits without protest or seeming awareness to this instance of the tyranny of labels.
[9] The word "warrant" when used in an instrument of conveyance is a typical example. Miss. Code Ann. § 89-1-33 (1972); see generally Hart and Sacks, note 2, supra, at 17-26; Cardozo, The Paradoxes Of Legal Science 70-72 (1928).
[10] 1 Williams & Meyers, Oil and Gas Law § 301 at 433 (1987).
[11] This term is misnamed. It is not a "right" at all. Property rights refer to entitlements and protections the law affords one from the interference of others. American Tobacco Co. v. Evans, 508 So.2d 1057, 1059 (Miss. 1987). The executive right is a legal power, not a right. One who possesses it has the authority to execute leases.
[12] The term "bonus" usually refers to the cash consideration paid by the lessee at the time of the execution of an oil and gas lease. The bonus is paid to the holder of the right to receive bonuses. This is usually the landowner (mineral owner), although there is no reason why the right to receive bonuses and the authority to execute leases need be in the same party, as this case will illustrate. Bonus for the execution of a lease may take other forms than cash. One form is called oil bonus or royalty bonus which is payable from production. 8 Williams & Meyers, Oil & Gas Law, Manual of Oil and Gas Terms 87 (1987); see also Ewing, note 8, supra, 39 Miss.L.J. at 51.
[13] term "delay rental" usually connotes a sum of money payable to the lessor by the lessee for the privilege of deferring the commencement of drilling operations or the commencement of production during the primary term of the lease.
8 Williams & Meyers, Oil & Gas Law, Manual of Oil and Gas Terms 230 (1987). Such payments are sometimes called lease rentals. See also Ewing, note 8, supra, 39 Miss.L.J. at 51.
[14] Here the term "royalty" is often used. One definition is "the landowner's (mineral owner's) share of production free of expenses of production." 8 Williams & Meyers, Oil & Gas Law, Manual of Oil and Gas Terms 856 (1987). Care is required to avoid confusion as there are many other types of royalties. See Williams & Meyers, supra, at 620, 633, 646, 674-80, 856-68.
[15] 1 Williams & Meyers, Oil & Gas Law § 301 at 434-39 (1987).
[16] Id.
[17] Even Harris v. Griffith, 210 So.2d 629, 634 (Miss. 1968), acknowledges this premise. See Blass, et al., An Analysis Of The Rights and Duties Of The Holder Of The Executive Right, 41 Miss.L.J. 189, 202 (1970). I understand Appellees System Fuels, Inc., et al. similarly to concede the point. See, e.g., the statement in their Brief in Support of Petition for Rehearing to the effect that "the right to receive bonus and rentals can be separated from the executive rights." In the same sentence Appellees describe this notion as a "principle which no one disputes." See Brief of Appellees in Support of Petition for Rehearing, page 1, filed October 6, 1987. [Emphasis supplied]
[18] See footnote 14, supra.
[19] The McLeods retained the authority to lease their undivided one-half mineral interest. That authority is not at issue in this litigation, nor is it affected by our decision.
[20] See generally, 1 Williams & Meyers, Oil & Gas Laws § 302 at 446-48 (1987).
[21] This, of course, is a rephrasing of what is said at the beginning of Section II above.
[22] I confess, see, e.g., Dennis v. Searle, 457 So.2d 941, 945-47 (Miss. 1984), and repent.
[23] See Holmes, The Path Of The Law, 10 Harv. L.Rev. 457, 464 (1897).
[24] Strunk & White, The Elements Of Style (3d ed. 1979). Compare Williams, Style (2d ed. 1981); U.S. Government Printing Office, A Manual Of Style (1986); and The Chicago Manual Of Style (13th ed. 1982).
[25] The Warranty Deed executed by Sarah Miller contained the following:

"subject to the reservation of all oil, gas and other minerals in, on and under the above described land by prior grantors."
468 So.2d at 866. Miller correctly held that this language merely protected the grantor's warranty and was insufficient to reserve mineral rights without a formal severance. At the time of the conveyance, there was no such reservation by prior grantors.
Miller presents an important nuance of the ordinary English rule of construction. The rest of the land records are readily available to the title searcher. One reading the Miller deed is charged by what he learned in junior high school to know that Sarah Miller did not reserve or sever any mineral estate. Sarah's language talks only of reservations by "prior grantors". If the title searcher wants to know what "prior grantors" have done, if anything, he may complete his examination of the land records, which, of course, he ought to do anyway. In a sense, this is going beyond the four corners of the Miller deed. Because the rest of the land records are readily accessible and because our interpretive effort remains in the objective world, the requirement is reasonable.
For a critique of Miller, see Comment, Oil and Gas: Use of the "Subject To" Clause In Mississippi Mineral Conveyancing, 55 Miss.L.J. 539 (1985) which, though thoroughly researched and carefully written, makes all of the mistakes noted here. In their concentration on the trees, the commentators have missed the forest. See also Note, Oil and Gas  Can A "Subject To" Clause Be A Valid Exception In A Mineral Deed?, 7 Miss.Coll.L.Rev. 105 (1986).
[26] S.B. Daws, owner of the land and one-fourth of the minerals conveyed to B.C. Arrington, retaining all mineral rights for twelve years. Prior to the expiration of the twelve years, Arrington conveyed to Van H. West by warranty deed with the following clause:

"All oil, gas and minerals and all oil, gas and mineral rights belonging to or appurtenant to said land is [sic] hereby reserved and excepted from this conveyance, said oil, gas and minerals and mineral rights having heretofore been reserved and excepted, and are not owned by grantor."
183 So.2d at 825. The grantee claimed the one-fourth minerals and said that the language was merely a protection of warranty. West correctly held that no mineral interest passed to West. The dominant language "reserved and excepted" the minerals. Even if the explanatory "said ... minerals and ... rights having heretofore been reserved ..." had been in error, the result would have been the same. Though inartfully used, the king's English still tells one and all that minerals are "reserved and excepted."
[27] The conveyance stated:

There is also excepted from this conveyance all oil, gas and mineral deposits on said lands, which the grantors hereto have promised to convey to Aquilla B. Cook.
195 Miss. at 648, 15 So.2d at 354.
Cook correctly held that the exception was ineffective to convey any interest to Cook but that the invalid reservation or exception operated as an exception to the grant.
[28] The Warranty Deed contained the following language:

This conveyance and warranty herein are made subject to prior reservations and conveyances of all of the oil, gas and other minerals in, on and under said lands.
320 So.2d at 383. Pfisterer held erroneously that the mineral interest owned by the grantors at the time of conveyance was reserved and that the grantee acquired only the surface estate. The language employed excepts from the conveyance "prior reservations". Only those minerals as were theretofore vested in other parties were reserved.
[29] The clause in Oldham's deed to Bell excepted "all minerals and mineral rights, heretofore sold and conveyed," 221 Miss. at 736, 74 So.2d at 825. The problem, of course, was that no minerals or mineral rights had theretofore been sold.

The Court held that a recitation that the minerals had been previously sold or conveyed will amount to a valid exception although the recital is false or although the prior conveyance did not effectuate a transfer of the property described therein. The Oldham holding was wrong. The language leads only to the linguistic conclusion that the exception was limited to minerals and mineral rights which had in fact and in law theretofore been sold and conveyed.
[30] Wilson is close. The conveyance was made "subject to one-half interest in mineral and oil rights as conveyed to Wm. Henderson." 213 Miss. at 182, 56 So.2d at 471. But there had been no conveyance to any Wm. Henderson. The Court held that the one-half mineral interest did not pass to the grantee because the one who makes the reservation or exception does not part with his full title or dominion. I think Wilson is wrong and here is why. The word "conveyed" is in the past tense. The best reading of "as conveyed" is "which has heretofore been conveyed". The language contemplates a historical fact which we know had not occurred. The "subject to" clause thus makes the conveyance subject to a non-existent fact, i.e. the conveyance is subject to nothing, i.e. the conveyance is without exception or reservation.
[31] Seven such sayings are listed in Ewing, note 8, supra, 39 Miss.L.J. at 48-50. Each is an empty vessel into which one may pour any content. I would replace them all with the approach outlined in this opinion.
[32] Physical inspection of the land is within the title searcher's access. Rights of parties in possession, deficiencies in quantity of land, roadways, unrecorded easements and servitudes and other matters that might be disclosed by an accurate survey or competent inspection of the land are matters I regard within the "objective accessible world."
[33] See UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., 525 So.2d 746, 753 (Miss. 1987).
[34] If you think about it, the familiar MMRT form R-101 is misnamed. The word "Right" is out of place. The word "Deed" should appear in the title, for the same reason it appears in instruments called warranty deeds and deeds of trust.
[35] Harris is subjected to compelling critique in Blass, et al., note 17, supra, 41 Miss.L.J. at 201-05.
[36] The dissenting Justices make much of the fact that in 1948 Thornhill filed for ad valorem tax exemption on the oil and gas interest obtained from the McLeods describing the interest as "1/2 royalty." Whatever the interpretation of the McLeod-Thornhill conveyance, Thornhill in 1948 would have owned one-half the royalty to be produced from the forty acres.